**Don L. SEWARD, Plaintiff,**

v.

**B.O.C. DIVISION OF GENERAL MOTORS CORPORATION, Defendant.**

No. 91 C 7599.

United States District Court, N.D. Illinois, E.D.

Oct. 26, 1992.

Don L. Seward, pro se.

Robert A. Wolf, Oak Park, Ill., for plaintiff.

Michael A. Warner, John L. Collins, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## ORDER

NORGLE, District Judge.

Before the court is defendant General Motor Corporation's ("GMC") motion for summary judgment. For the following reasons, the motion is granted.

## FACTS

Prior to December 31, 1989, plaintiff Don L. Seward ("Seward") was employed by the B.O.C. (Buick, Oldsmobile, Cadillac) Division of General Motors Corporation. Seward had been employed by GMC since graduating from college with a bachelor's degree in business administration in 1952, and since 1966, had worked in various management/supervisory positions. The final position held by Seward at GMC was that of a "shift superintendent," who was responsible for approximately 430 people and the production of approximately $300,000 of salable product per shift. Seward received an annual salary of $64,020 as compensation for his employment.

In November, 1986, GMC announced that by 1990 it would close the manufacturing plant at which Seward was employed, and that plant ceased production by July, 1989. In connection with the plant's closing, GMC announced a Special Retirement Program whereby employees aged fifty-five through fifty-nine could elect to retire and receive special benefits. To receive these special benefits, eligible employees were required to sign an agreement entitled "Statement of Acceptance of Special Retirement" (the "Release"). Seward signed the Release on May 11, 1989, thereby agreeing to retire effective January 1, 1990. In the Release, Seward acknowledged that he was accepting GMC's offer of special retirement "voluntarily with full knowledge of its significance, including the fact that by accepting it [he] waive[d] any claim in any way connected with [his] separation from employment with General Motors." The Release further stated:

> I acknowledge that no prior representations, promises or agreements relating to my employment and retirement have been made by General Motors which are contrary to this Agreement and that the special retirement offer and my acceptance of the special retirement offer constitute the entire and only agreement between me and General Motors.
>
> . . .
>
> In consideration of the terms of the special retirement offer, I hereby release and forever discharge General Motors and its officers, directors and employes for all claims, demands, and causes of action, known or unknown, which I may have based on the cessation of my employment at General Motors. This release specifically includes any possible claims I may have under the Age Discrimination in Employment Act, the fair employment practice or civil rights law of Illinois, and any other federal, state, or local law, order, or regulation, or the common law relating to employment and any claims for breach of employment contract, either express or implied.
>
> I further agree not to institute any proceedings against General Motors or its officers, directors, agents, employes, or stockholders, based on any matter relating to the cessation of my employment at General Motors, including, without limitation, actions under the Age Discrimination in Employment Act and the fair employment practice or civil rights law of Illinois.

Seward signed the Release, after having read the agreement, so that GMC would continue to employ him through the plant closing date. In addition to signing the Release, Seward also signed a written calculation of his retirement benefits. Seward understood that the effect of signing this document was that he would be retired thereafter, and Seward retired as agreed. Once retired, Seward began receiving retirement benefits in excess of $36,000 annually. Additionally, because of his participation in the special retirement program, Seward received supplemental benefits of $953.22 per month from January 1, 1990 to September 30, 1990 and $976.61 per month from October 1, 1990 to his sixty-second birthday, July 6, 1992.

Prior to his retirement, six and a half weeks after reading and signing the Release, Seward attempted to revoke the Release. After speaking with at least two personnel administrators about his ability to revoke the Release, Seward submitted the following written statement:

> I am not interested in voluntary retirement. I would prefer to continue my employment with General Motors.
>
> Due to my age, years of service and few opportunities in my classification and there were several people in my classification who needed jobs and had no retirement option, I decided to sign the retirement sheet that was prepared for me to retire 1/1/90.
>
> I have always indicated my desire to continue my employment with GM on the three surveys that were taken and on my goldenrod sheet for my annual review. During the next six months I want to be considered for comparable job openings. (dated June 26, 1989)

Seward tendered this letter to GMC personnel, but was nevertheless retired on De-

cember 31, 1989. Shortly thereafter, Seward filed a charge of age discrimination with the Equal Employment Opportunity Commission, which issued a Notice of Right to Sue on September 26, 1991. Subsequent to the EEOC's issuance, Seward filed the instant action pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, alleging that the actual reason he was discharged was because of his age. Seward further claims that he was forced to retire and that GMC refused to place him in another position within the corporation, even though he was at least as qualified, if not more qualified, to assume positions that were awarded to younger managers who were transfered to other GMC plants. In response to Seward's complaint, GMC has filed the present motion for summary judgment, asking the court to find that Seward waived his rights to such a claim by executing the Release or, alternatively, that even if the Release is otherwise invalid, Seward's retention of the enhanced retirement benefits has ratified it, barring Seward's claim.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that for a party to prevail on a summary judgment motion "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Even though all reasonable inferences are drawn in favor of the party opposing the motion, *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir.1992), a scintilla of evidence in support of the nonmovant's position will not suffice to oppose a motion for summary judgment. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir.1991). Instead, the nonmoving party must elucidate specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Moreover, to preclude summary judgment the disputed facts must be those that might affect the outcome of the suit, *First Indiana Bank v. Baker*, 957 F.2d 506, 508 (7th Cir.1992), and a dispute about a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims and defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Accordingly, the nonmoving party is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories and admissions on file to designate specific facts showing a genuine issue for trial. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

In response to GMC's motion, Seward has attacked the validity of the Release as to waivers of claims under the ADEA. The United States Supreme Court has held that a plaintiff may waive a cause of action under Title VII of the Civil Rights Act of 1964 by knowingly and voluntarily executing a release of claims, *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1021 n. 15, 39 L.Ed.2d 147 (1974), and this voluntary and knowing standard has been applied to releases executed in cases involving the ADEA. *Riley v. American Family Mutual Ins. Co.*, 881 F.2d 368, 373 (7th Cir.1989); *Bormann v. AT & T Communications Inc.*, 875 F.2d 399, 402 (2nd Cir.), *cert. denied*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989). While under *Alexander* and *Riley* a release is effective if the employee's consent was voluntary and knowing, the release must also be unambiguous. *See Riley*, 881 F.2d at 373. In light of these requirements, Seward claims that questions of material fact exist as to whether the Release contains the requisites established by the *Alexander* and *Riley* courts.

A contract is ambiguous when its contents are reasonably susceptible to more than one meaning. *White v. White*,

62 Ill.App.3d 375, 379, 19 Ill.Dec. 380, 378 N.E.2d 1255 (1978). The terms of a contract must be given their ordinary and natural meaning when such terms are clear and unambiguous, and "no parol or extrinsic evidence may be considered to vary the meaning of the terms." *Susmano v. Associated Internists of Chicago, Ltd.*, 97 Ill. App.3d 215, 219, 52 Ill.Dec. 670, 422 N.E.2d 879 (1981). The pertinent provision of the Release, waiving any claims Seward may have against GMC states that he "waives," "release[s]," and "forever discharge[s]" any claims he may have based on his retirement. Application of the principles cited above to the language of the Release reveals a clear, unequivocal, and unambiguous waiver of the claim for which Seward now seeks recovery.

Despite the clarity of the Release, it will not be enforced and Seward may proceed with his age discrimination claim if Seward's assent to the unambiguous language was not knowing and voluntary. The Seventh Circuit has defined the "knowing" requirement in the context of an ADEA release to mean executed purposefully, and not because of a mistake or accident. *Riley*, 881 F.2d at 373; *see also Samman v. Wharton Econometric Forecasting Assoc., Inc.*, 577 F.Supp. 934, 935 (D.D.C.1984) ("knowing" component requires that plaintiff knew of the basis for a claim at the time the release was executed). The voluntary component of the enforceability analysis suggests that a release, to be valid, be free from claims of fraud or duress. *Constant v. Continental Telephone Co.*, 745 F.Supp. 1374, 1381 (C.D.Ill. 1990). Seward has not claimed that he was unaware of the significance of the Release or that it was signed accidentally or mistakenly; however, Seward has stated that he did not want to sign the Release, principally because he did not agree with its implication that he was initiating a request to retire. He further proclaims that he was pressured into signing the Release by the supplication of the personnel adminis-

trator who presented the Release to Seward. Moreover, Seward contends that he was coerced into executing the Release because GMC denied him educational opportunities which were made available to other similarly situated managers, transferred him from first to second shift, and criticized him for problems which second shift supervisors had never before been criticized. Through these assertions, Seward has essentially alleged the defense of duress.

To establish a claim of compulsory duress under Illinois law sufficient to void a contract or release, a party must demonstrate that the duress left such party "bereft of the quality of mind essential to the making of a contract." *Kaplan v. Kaplan*, 25 Ill.2d 181, 186, 182 N.E.2d 706, 709 (1962). Thus, duress is a condition that forces a party to act against its own free will. Accordingly, duress will not be present if a party had an option or choice as to whether it would do the thing or perform the act said to have been done under duress. *Joyce v. Year Invest., Inc.*, 45 Ill. App.2d 310, 314, 196 N.E.2d 24, 26 (1964). Furthermore, acts or threats cannot constitute duress unless they are wrongful. This rule, however, is not limited to criminal, tortious, or contractual violations, but extends to acts that are wrongful in a moral sense. *Kaplan*, 25 Ill.2d at 186, 182 N.E.2d at 709.

Seward's allegations, viewed in light of these principles, fall short of establishing grounds upon which to lay a claim of legal duress. Seward alleges that the purported duress was imposed in two ways: through GMC's harassment of Seward in the above-mentioned manners and through the importunity of GMC's administrative personnel. GMC's actions were not threatening or wrongful. Furthermore, Seward's own post-release correspondence with GMC is silent as to any allegations of duress, and instead, offers a valid explanation of why Seward executed the Release.[1] In

---

1. Seward's letter to Irene Meske (GMC personnel administrator) stated that he was signing the "retirement sheet" because of his age, his years of service, the lack of opportunities available to

him, and because of the needs of younger employees lacking the retirement option to have jobs.

sum, GMC's conduct was not of the nature, nor made under such circumstances, sufficient to cause Seward reasonably and adequately to lose control over his own free will. Resolving all facts in Seward's favor, the court finds that Seward has failed to raise any issues of material fact to support his accusation of duress.

 In addition to claiming duress, Seward has also asserted that he lacked assistance of counsel, thereby preventing the voluntary and knowing execution of the Release. Seward has submitted an affidavit that states that when he was given the Release to sign "neither [GMC personnel administrator] Meske nor anyone else employed by [GMC] gave [Seward] an opportunity to have the document reviewed by an attorney, nor did anyone suggest that [Seward] do any such thing. Additionally, [Seward] was given no opportunity ... to negotiate the terms contained in the [Release]." Representation and negotiation are not the *sine qua non* of an effective release. *Fortino v. Quasar Co.*, 950 F.2d 389, 395 (7th Cir.1991). "If criminal defendants can effectively waive assistance of counsel, as of course they can, so can persons asked to release civil claims." *Id.* Seward has not presented any evidence that he requested GMC allow his counsel to review the Release or that he requested to negotiate the terms therein, and he has not suggested that GMC would have refused such requests had they been made. Furthermore, Seward has not claimed ignorance of the legal effect of the Release, nor has he alleged that he misunderstood the contents of the Release. Contract negotiations are adversarial proceedings, and the failure of one party to urge another to consult with counsel or to offer to negotiate its own proposal is not so wrongful that it vitiates the other's knowledge of the contract, nor does it destroy the other's ability to act under its own free will. Nevertheless, in judicial decisions that have examined the validity of a waiver of claims under the ADEA, whether the plaintiff had consulted an attorney prior to signing the agreement has been a significant, although not a determining, factor. *See Riley,* 881 F.2d at 374 (inquiry into subjective intent of waiving party may be necessary where plaintiff was not represented by counsel and possesses a limited education); *Coventry v. U.S. Steel Corp.,* 856 F.2d 514 (3rd Cir.1988) (absence of counsel resulted in a decision the legal significance of which plaintiff did not understand completely);[2] *Runyan v. National Cash Register Corp.,* 787 F.2d 1039, 1044 (6th Cir.) (*en banc*) (significant to the determination of the validity of the waiver was the fact that plaintiff was a labor lawyer with may years of experience), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986); *E.E.O.C. v. American Express Pub. Corp.,* 681 F.Supp. 216, 220 (S.D.N.Y.1988) (fact lawyer was not present when plaintiff signed agreement and did not negotiate agreement was an issue of material fact requiring adjudication prior to the determination of the validity of plaintiff's release). However, in light of Seward's education, his years of experience with GMC, and his knowledge of contract law,[3] the absence of counsel and the lack of negotiation did not prevent Seward from understanding the legal significance of his decision to execute the Release. Consequently, Seward's allegations as to lack of representation and lack of opportunity to negotiate do not present the existence of material facts upon which summary judgment will be denied.

 In addition to the arguments discussed above, Seward also contends that his belief that the Release did not bestow upon him any benefits other than those otherwise attributable to employees who were fifty-eight years-old with thirty years of service with GMC. Seward argues that he "could not have knowingly signed the

---

**2.** In a footnote to its decision, the Sixth Circuit noted that Judge Hutchinson was unable to conclude on the record that the plaintiff needed a lawyer to advise him on the release's possible effect on his ADEA retaliation claim.

**3.** Seward is a registered real estate agent and, since 1984, has operated his own real estate business. Additionally, Seward had studied the law of contracts in connection with real estate. Defendant's Rule 12(m) Statements of Fact at 2.

waiver if he did not know that he was receiving anything of value in exchange for his right to bring an action." Seward does not argue that the release was in fact not supported by consideration; instead, Seward merely claims that he was mistaken as to the existence of consideration and the enforceability of the Release.

Seward's alleged mistaken opinion of the legal effect of the release, however, cannot as a matter of law affect the enforceability of the release. *McCarthy v. McCarthy*, 9 Ill.App.2d 462, 133 N.E.2d 763, 769 (1956). "If you sign a release knowing what you are giving up but believing … that really you're giving up nothing because the release is unenforceable, you are bound by your decision." *Fortino*, 950 F.2d at 395. Seward suggests that the court inquire into his subjective intent at the signing of the Release. Such an inquiry, however, would unduly hamper the voluntary settlement of ADEA claims by enabling a plaintiff to avoid the consequences of the plain language of a release by an examination of the plaintiff's state of mind. *Riley*, 881 F.2d at 374. Seward was college educated, he signed a release with simple language specifically addressing ADEA claims, and he had at least some knowledge of contract law. Seward's alleged mistaken belief that the Release lacked consideration did not interfere with his comprehension of the Release's legal significance, or consequently, his ability to knowingly sign the waiver.

As a final attempt to demonstrate that the Release was not signed knowingly and voluntarily, Seward has identified certain statements made by a GMC personnel administrator (the "Administrator") representing that the Release could be revoked at any time. Prior to signing the Release, Seward claims that he inquired as to his right to change his mind and revoke it, to which he allegedly received an affirmative answer. Seward contends that the Administrator told him that he could withdraw the Release whenever he so wished, and that the Administrator informed him of an instance in which another GMC employee had revoked his written intent to retire.

Furthermore, Seward claims that the Administrator informed him that she needed to have all GMC employees "categorized" (i.e. identified as transferring, retiring, etc.) for an upcoming meeting with GMC officials and that all employees other than Seward had been categorized. Seward asserts that he executed the Release based on this information and that this information was false. Seward contends that material issues of fact exist as to whether he would have signed the release had he known that GMC's statements were false.

In essence, Seward asserts that the Administrator's alleged fraudulent statements induced his execution of the Release. In order to constitute fraudulent inducement, a representation: (1) must be one of material fact which has been made for the purpose of inducing the other party to act, (2) must be known by the maker to be false, but reasonably believed by the other party, and (3) must be relied upon by the other party and acted upon to his damage. *General Electric Credit Auto Lease, Inc. v. Jankuski*, 177 Ill.App.3d 380, 383, 126 Ill.Dec. 676, 678, 532 N.E.2d 361, 363 (1988); *Ainsworth Corp. v. Cenco Inc.*, 107 Ill.App.3d 435, 63 Ill.Dec. 168, 437 N.E.2d 817 (1982). If established, fraudulent inducement is sufficient to invalidate a contract. *Id.* Nevertheless, a defense of fraud is ordinarily unavailable to avoid the effect of a written agreement if the complaining party could have discovered the fraud by reading the instrument and was afforded a full opportunity to do so. *Belleville Nat'l Bank v. Rose*, 119 Ill.App.3d 56, 74 Ill.Dec. 779, 456 N.E.2d 281 (1983). Furthermore, absent manifest inequality between the respective parties, one who is aware of the nature and character of the instrument being signed cannot subsequently avoid the terms of the instrument by claiming to have been deceived by representations outside the instrument itself. *American Savings Association v. Conrath*, 123 Ill.App.3d 140, 146, 78 Ill.Dec. 730, 735, 462 N.E.2d 849, 854 (1984).

Seward has implied that the Administrator's alleged false representation

that all other employees had been "categorized" somehow induced him to sign the Release. Even assuming that this statement was false and was made for the purpose of inducing Seward to act, such a statement is not, as a matter of law, a material fact upon which Seward could be justified in relying. The statement that all other employees in Seward's situation had signed the Release is not a matter to which a reasonable person would attach importance in determining whether to execute the document in question. *See Buechin v. Ogden Chrysler–Plymouth, Inc.*, 159 Ill. App.3d 237, 111 Ill.Dec. 35, 511 N.E.2d 1330 (1987) (plaintiff defrauded when sold a "new" car without being told of previous owner); *Richmond v. Blair*, 142 Ill.App.3d 251, 94 Ill.Dec. 564, 488 N.E.2d 563 (1985) (house purchaser defrauded by real estate broker's presale assurances that water seepage had been corrected); *Bank of Northern Illinois v. Nugent*, 223 Ill. App.3d 1, 165 Ill.Dec. 514, 584 N.E.2d 948 (1991) (plaintiffs defrauded by loan recipient's intentional misrepresentation of economic condition of company). The Administrator's representation was not the type of statement the veracity of which would be material to Seward's decision to execute the Release, and thus, was not a fraudulent inducement rendering the Release unenforceable.

Seward asserts that the Administrator's statement regarding the revocability of the Release was an agreement or promise that GMC would treat the Release as unilaterally revocable by Seward. The Release, however, acknowledged in simple clear language that no other promises were made and that the document constituted the entire and exclusive agreement. Seward, as signatory to the Release, was not at liberty to accept the Administrator's prior representation, if made, that the Release could be rescinded at Seward's request be-

cause Seward acknowledged in the Release that no other "representations, promises or agreements" relating to his retirement had been made. *See Hurley v. Frontier Ford Motors, Inc.*, 12 Ill.App.3d 905, 299 N.E.2d 387 (1973) (buyer of used car precluded from relying on salesman's oral promise to repair where buyer could have noted discrepancy before signing "as is" contract); *American Sav. Assoc. v. Conrath*, 123 Ill. App.3d 140, 78 Ill.Dec. 730, 462 N.E.2d 849 (1984) (complaining party could have discovered the fraud by reading the written document). Any reasonable reading of the Release should have alerted him that any prior agreement made with respect to his retirement, but not embodied in the Release, would not be honored by GMC. *Belleville Nat'l Bank v. Rose*, 119 Ill. App.3d at 59, 74 Ill.Dec. at 782, 456 N.E.2d at 284 (defense of fraud unavailable to avoid the effect of written agreement where complaining party could have discovered the fraud by reading the instrument).

In sum, Seward has asked the court to accept parol evidence of an alleged contractual right to unilateral rescission. Such a right would enable Seward to relieve himself of all obligations under the Release at his whim. Seward has not raised a genuine issue of fact that, with his college business education, years of supervisory experience, and real estate experience, he justifiably relied on this position when executing the Release. Because Seward has raised the alleged misrepresentations of the Administrator in an attempt to thwart GMC's motion for summary judgment, he must demonstrate with more than a scintilla of evidence that material issues of genuine fact exist as to the validity of the Release. *Brownell*, 950 F.2d at 1289. Self-serving statements of alleged parol misrepresentations summarily embodied in a response to a motion, unsupported by affidavits or any other evidence,[4] are insufficient to create

---

4. Seward has submitted his own affidavit as an exhibit to his response to GMC's motion. This affidavit, however, is silent as to any facts regarding the alleged fraud or deceit purported to be the inducement for Seward's signature on the Release. Furthermore, in support of his allegation that the Release could be revoked at his

will, Seward has submitted a copy of the letter he claims was delivered to GMC as a revocation of the Release. Despite Seward's contention that this communication, delivered one and one-half months after the Release was signed, was a letter of revocation, the letter expressly states no more than Seward's lack of interest in retire-

**632**

genuine issues of fact in this matter. *See Aungst v. Westinghouse Electric Corp.,* 937 F.2d 1216 (7th Cir.1991) (self-serving testimony regarding plaintiff's own ability to work insufficient to contradict negative assessment of that ability); *United States v. Binzel,* 907 F.2d 746 (7th Cir.1990) (self-serving allegations insufficient to raise genuine issue of fact which would preclude summary judgment). Accordingly, the court finds that there is no genuine issue of material fact that the Release executed by Seward was fraudulently induced.

■■■ In its motion for summary judgment, GMC argues that even if the execution of the Release was somehow defective, Seward's failure to tender back to GMC the consideration he received in exchange for his waiver of claims constitutes a ratification of the Release. Such a ratification would render the Release enforceable, affording GMC the benefit of its bargain. In *Grillet v. Sears, Roebuck & Co.,* 927 F.2d 217 (5th Cir.1991), the plaintiff over a period of months received approximately $36,000 in exchange for executing a release waiving any claims she might have against Sears. The Fifth Circuit held that, even assuming a release was tainted with fraud and duress, the plaintiff's failure to return the consideration upon her discovery of the fraud and duress ratified the release. *Id.* at 221. Specifically, the *Grillet* court stated:

A party cannot be permitted to retain the benefits received under a contract and at the same time escape the obligations imposed by the contract. If a releasor, therefore, retains the consideration after learning that the release is voidable, her continued retention of the benefits constitutes a ratification of the release.

. . .

Even if Grillet's release was tainted by misrepresentation, Grillet ratified the release by keeping its benefits for an unreasonably long period of time.

*Id.* at 220–21 (citations omitted); *see also Cumberland & Ohio Co. v. First American Nat'l Bank,* 936 F.2d 846, 850 (6th Cir.1991), *cert. denied* — U.S. —, 112 S.Ct. 878, 116 L.Ed.2d 783 (1992) (releasor who retains consideration after learning that a waiver and release is voidable effectively ratifies the release); *but see Forbus v. Sears Roebuck & Co.,* 958 F.2d 1036 (11th Cir.1992), *petition for cert. filed* (Sept. 14, 1992) (where invalid releases under the ADEA have been executed there is no tender-back requirement for instituting an ADEA suit).

The Fourth Circuit reached the same result in *O'Shea v. Commercial Credit Corp.,* 930 F.2d 358 (4th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 177, 116 L.Ed.2d 139 (1991). In *O'Shea,* the plaintiff signed a release in exchange for severance pay and other benefits. Despite having signed the release, the plaintiff brought suit under the ADEA alleging the release was not knowingly or voluntarily signed. *Id.* at 361. The Circuit Court upheld the District Court's grant of summary judgment in favor of the defendant, stating:

[E]ven if the release executed by the [employee] was invalid, the [employer] would have prevailed on the ground that the [employee's] subsequent acceptance of the severance pay demonstrated an intent to ratify the agreement. It is a well-established proposition that the retention of the benefits of a voidable contract may constitute ratification.

*Id.* at 362 (citations omitted).

The events that Seward claims invalidate the Release occurred prior to his retirement on January 1, 1990. Every month after his retirement until his sixty-second birthday, from January 1, 1990 to July 6, 1992, Seward accepted more than $900 in additional benefits from the Release, despite his apparent belief that the Release was invalid or had been revoked. Furthermore, Seward continued to accept enhanced monthly benefits even after initiating this

ment, his preference for continued employment, his reasons for signing the Release, his history of expressing his desire to continue working for GMC, and his desire to be considered for appropriate jobs for the "next six months" (the period

after which he was scheduled to retire). The letter makes no specific reference to an alleged right of revocation, nor does it specifically state, or even imply, that Seward unconditionally revoked the Release.

suit in violation of the express terms of the Release. Through his actions, Seward has attempted to have his cake and eat it too. To avoid ratifying the Release through his conduct, Seward should have at least refused the additional retirement benefits once he learned of the alleged invalidity of the Release. *See Anselmo v. Manufacturers Life Ins. Co.,* 771 F.2d 417 (8th Cir. 1985) (silence and acquiescence for a considerable period after execution, action in accord with, and acceptance of benefits under contract amount to ratification). Instead, Seward retained and continued to receive the benefits of the Release after he discovered the alleged fraud and duress. Accordingly, Seward cannot avoid ratification.

Notwithstanding the logic of the Fifth and Fourth Circuits, Seward urges that court follow the holding of *Isaacs v. Caterpillar, Inc.,* 765 F.Supp. 1359 (C.D.Ill.1991). The *Isaacs* district court ruled that plaintiffs who received certain benefits for signing a purported release were not required to tender back the consideration they received as a prerequisite to bringing an ADEA claim. The *Isaacs* decision, however, and the seminal case upon which it relied, *Hogue v. Southern R. Co.,* 390 U.S. 516, 88 S.Ct. 1150, 20 L.Ed.2d 73 (1968) (holding a tender back of consideration is not required for FELA claim in which mutual mistake of fact existed when release was signed), are distinguishable from the situation before the court. Neither *Isaacs* nor *Hogue* involved a situation in which a plaintiff continued to receive and retain the benefits of a release while cognizant of facts, which if true, would invalidate the release. To apply the holding of the court in *Isaacs* to Seward's case would encourage releasors with potential ADEA claims to postpone raising such claims and asserting the invalidity of their releases until the latest possible date, because they would have nothing to lose and the continued receipt of release benefits to gain. Accordingly, the court declines to apply the *Isaacs* and *Hogue* analysis to the present situation, in which the releasor was aware of issues regarding the validity of the waiver but continued to accept the retirement funds tendered to him.

Seward further requests that this court adopt the holdings reached in *Oberg v. Allied Van Lines,* No. 91 C 6576, 1992 WL 211506 (N.D.Ill. Aug. 26, 1992), and *Collins v. Outboard Marine Corp.,* No. 91 C 4313, 1992 WL 209279 (N.D.Ill. Aug. 17, 1992). Each of these cases, however, was decided in light of recent amendments to the ADEA, namely, the Older Workers Benefit Protection Act ("OWBPA"), Pub.L. No. 101–433, 104 Stat. 983 (1990). The OWBPA details the minimum requirements necessary for ADEA waivers to be considered knowing and voluntary. The *Oberg* and *Collins* courts found that the OWBPA's strict requirements for a knowing and voluntary waiver preclude waiver by ratification. *Oberg* at *6 (finding that ratification would as a practical matter undo the OWBPA's waiver provision); *Collins* at *4 (where release fails OWBPA's waiver requirements it cannot constitute a legal waiver of an ADEA claim; therefore, there can be no legal obligation that can be ratified). Because the OWBPA codification of the voluntary and knowing requirements was not in existence at the time the Release was executed, the findings of the *Oberg* and *Collins* courts are inapplicable to the present case. *See Oberg* at *5 ("Prior to the enactment of the OWBPA, a release that was not knowing and voluntary when initially executed might have become enforceable through ratification if the employee both gained the knowledge withheld from her at the time of the signing and then voluntarily retained the benefits of her bargain").

Seward validly waived his right to redress an alleged ADEA claim against GMC by his voluntary and knowing execution of the Release. At the time of the waiver, he had the quality of mind essential to making a contract. The court finds that Seward raises no issues of material fact which support allegations that the Release was not knowingly and voluntarily executed. Furthermore, even if Seward's claims of fraud and duress were true, Seward nevertheless ratified the Release by keeping its benefits despite his awareness of the alleged cir-

**634**

cumstances that purportedly rendered it invalid. The court does not hold that Seward, prior to initiating this suit, was obligated to tender back to GMC the supplemental retirement benefits which he received. Rather, the court holds that Seward, to avoid ratification of the Release, was obligated to tender back or refuse the benefits he received after he became aware of the alleged fraud and duress he now raises as a defense to the Release.

### CONCLUSION

For the reasons stated above, GMC's motion for summary judgment is granted.

IT IS SO ORDERED.