WITOLD RYBICKI, Plaintiff-Appellant, v. ANESTHESIA & ANALGESIA ASSOCIATES, LTD., *et al.*, Defendants-Appellees.

Fourth District   No. 4—92—0658

Argued March 24, 1993.—Opinion filed June 24, 1993.

William A. Allison (argued), of Allison & Kelly, of Bloomington, for appellant.

Jeffrey Alan Ryva (argued), of Husch & Eppenberger, of Peoria, for appellees.

JUSTICE LUND delivered the opinion of the court:

Plaintiff Witold Rybicki, an anesthesiologist, entered into employment contracts with Anesthesia & Analgesia Associates, Ltd. (Associates), a corporation solely owned by Ettore DiMiceli. DiMiceli is also an anesthesiologist, and the Associates was in the business of providing analgesia services to a hospital medical center. The present action initially arose following plaintiff's termination in December 1989 and a dispute over profit-sharing contributions, proper bonus payments, and severance pay. The principal issue on appeal relates to the profit-sharing issue. Plaintiff appeals following a bench trial and a judgment in defendants' favor by the circuit court of McLean County.

I. Facts

Plaintiff's first contract with Associates was dated November 17, 1985, and ran from December 9, 1985, until June 13, 1986. This contract did not provide for profit-sharing or a bonus. The second contract was dated July 18, 1986, and provided for a period beginning July 1, 1986, "and continuing unless terminated in a manner set forth in Paragraph 7." This contract provided for an annual salary of $95,000, plus a 10% bonus of paid fees earned by plaintiff over $140,000 and under $180,000, and 25% of paid fees over $180,000. The contract further provided:

> "Employee will receive a contribution in his behalf to the corporate profit[-]sharing plan which shall be subject to all the rules and regulations set forth by the Internal Revenue Service and those laws governing such plans."

Admitted into evidence was plaintiff's exhibit No. 3, a summary dated July 14, 1986, prepared by DiMiceli on Associates' letterhead, which provided:

> "The following are very accurate estimates of the cost to the corporation for an anesthesiologist at the contract salary level:

| | |
|---|---|
| Salary | $ 95,000.00 |
| Profit Sharing | 14,250.00 |
| Malpractice | 14,000.00 |
| Health Insurance | 1,350.00 |
| Meetings | 1,000.00 |
| Associates Dues | 1,000.00 |
| Collections and Overhead (assuming 10% on collection of $150,000.00) | 15,000.00 |
| Total | $141,600.00 " |

Plaintiff testified that the $14,250 listed on exhibit No. 3 was the amount agreed by DiMiceli to be paid into the corporate profit-sharing plan each year on plaintiff's behalf. DiMiceli testified that exhibit No. 3 was prepared to establish a basis for bonus payments and used to explain the basis to plaintiff. DiMiceli contends contributions to the profit-sharing plan were always discretionary, and not intended to be fixed.

The profit-sharing trust and plan (plan) for Associates was adopted on October 1, 1978, as shown by an amendment adopted on June 20, 1985. The plan provided for deferment of taxation and provided that all contributions must be paid from Associates' profits. Plan qualifications apparently require one year of employment, with at least 1,000 working hours during that year before eligibility. (The copy of the 69-page plan in the record before us, exhibit No. 10, is missing every other page.)

It is apparent that the contribution of income to the plan would be allocated on a proportional basis to all included employees. Plaintiff's exhibit No. 13 was a "CERTIFICATE OF PARTICIPATION AND SUMMARY PLAN DESCRIPTION FOR WITOLD RYBICKI-A PARTICIPANT IN THE EMJAY PROFIT[-]SHARING PLAN FOR ANESTHESIA AND ANALGESIA ASSOC., LTD." The summary clearly states contributions are dependent upon profits. The summary includes a statement that "[t]he Company decides each year, depending on profits, how much of a contribution will be made." Paragraph No. 4.2 of the plan provides for allocation of contributions. The allocation of company contributions is integrated with social security, with the company paying social security taxes up to the maximum allowable amount.

## II. Example Of Allocation Of Employer Contribution To Profit-Sharing Plan

This example is provided *in an attempt* to illustrate why an employee's employment contract containing an annual fixed profit-sharing amount has the effect of determining the total employer annual contribution and the amount allocated to each employee's account. If two employees had contracts with fixed annual contributions, the plan allocation provisions could not be implemented unless there were identical incomes and agreed-to contributions.

For purposes of this explanation, we are ignoring the top-heavy provisions. Of the total amount allocated by the employer to the plan, the plan trustee shall first allocate to the account of each participant an amount up to 5.7% of the participant's compensation which is in excess of the maximum taxable wage base (maximum subject to social security tax) which, for 1987, was $43,800. Assuming the contribution exceeded the amount computed by the 5.7%, then the balance must be allocated in the same proportion that the participant's compensation bears to the compensation of all such participants.

Taking the year 1987 as an example, and assuming two employees being paid $95,000 and the corporate officer being paid $200,000:

### First Step

| | Pay | Social Security Maximum Base | Excess Pay | 5.7% Required | Based Upon Salary—% Each Receives of Balance of Total Contribution |
|---|---|---|---|---|---|
| Employee A | $95,000 | -$43,800 | $51,200 | 2,918.40 | 24% |
| Employee B | $95,000 | -$43,800 | $51,200 | 2,918.40 | 24% |
| Officer C | $200,000 | -$43,800 | $156,200 | 8,903.40 | 52% |
| | | | | $14,740.20 | |

To be able to deposit $14,250 in plaintiff's account in 1987, based upon the above assumptions, first deduct $2,918.40 from $14,250.00 equals $11,331.60; and then divide $11,331.60 by 24% equals $47,215; and add the total of the 5.7% payments (or $14,740.20), for a required contribution by the corporation of $61,955.20 ($47,215 plus $14,740.20) to the 1987 profit-sharing plan.

### III. CORPORATE TAX RETURN INFORMATION
Associates' corporate tax returns contained the following totals:

| Return Period | Gross | Officer (DiMiceli) Compensation | Other Employee Compensation | Corporate Income |
|---|---|---|---|---|
| June 1, 1986, through May 31, 1987 | $753,923 | $270,000 | $276,444 | $43,864 |
| June 1, 1987, through December 31, 1987 (six months) | $472,269 | $113,846 | $216,124 | $51,840 |
| 1988 | $816,417 | $444,746 | $389,138 | ($159,784) |
| 1989 | $984,629 | $448,325 | $435,129 | ($11,457) |

Shareholder equity:  May 31, 1987—$467,886
December 31, 1987—$414,407
December 31, 1988—$316,940
December 31, 1989—$7,444

Shareholder equity on May 31, 1987, December 31, 1987, and December 31, 1988, consisted basically of cash and accounts receivable, and was probably accumulated corporate net income which could be used for profit-sharing contributions.

### IV. SUBSEQUENT EMPLOYMENT CONTRACTS
A letter to plaintiff from DiMiceli dated June 22, 1988, had given plaintiff three options: (1) continue the July 18, 1986, contract; (2) terminate that contract and sign the new one enclosed; or (3) sign a termination of the July 18, 1986, contract with no new contract available. Plaintiff evidently signed the enclosed (June 27, 1988) contract. The new employment contract provided "for a period beginning on the first day of July, 1988, and continuing unless terminated in a manner set forth in Paragraph 7." Salary was set at $100,000 per year, and the same bonus provision was included. *The profit-sharing provision was deleted.* On July 25, 1989, a new contract was executed which provided for a salary of $10,000 per month and a different bonus arrangement. No profit-sharing plan was included. The hospital

contract with Associates was terminated, plaintiff's employment was terminated in December 1989, and the plan was terminated the following year. A benefit statement to plaintiff from the plan at the end of 1989 showed $3,890.37 vested in his account, of which $3,276.64 appears to have been contributed by Associates.

## V. Issues On Appeal

This appeal is centered on counts I, II, III, and VI of plaintiff's complaint. The crux of counts I and II is that Associates contracted with plaintiff to contribute to the plan pursuant to the agreement in the contract dated July 18, 1986, and that Associates promised the contribution would be $14,250 per year. Count III alleged that the $14,250 contribution was also an entitlement, under some theory, within the 1988 contract. Count VI was against DiMiceli, charging intentional misrepresentation to plaintiff that Associates would make a contribution of $14,250 per year for plaintiff's profit-sharing account beginning July 18, 1986. On April 20, 1992, after trial, the court granted judgment in favor of both Associates and DiMiceli against plaintiff on counts I, II, III, and VI. At the end of the trial, the judge made a statement, which included the following:

"[T]here is conflicting evidence particularly in the testimony of the two doctors here as to what transpired and what was said in regard to the 1986 contract which was entered into July 18th and the discussion apparently taking place between them four days previously on the 18th of July. When there is that type of conflict in the testimony of witnesses, the Court starts to look to the various relevant documents that might be of some assistance in trying to reconstruct the events.

One of those is Plaintiff's Exhibit 3. That document when it is read and considered indicates as part of its content that it is setting out essentially the cost to the corporation for an anesthesiologist. More specifically, it indicates that the amounts shown are very accurate estimates of the cost to the corporation. Dr. DiMiceli testified that the fourteen thousand two hundred fifty dollar figure shown in the exhibit as profit-sharing was arrived at and set out in that exhibit as the maximum amount that might be contributable in profit-sharing on behalf of a person whose salary was ninety-five thousand dollars, and a fifteen percent limit on that amount was what the maximum amount could be that would be contributable as profit-sharing.

All that it seems to the Court is consistent with [the] Defendant's [sic] version here that what was being attempted here

was to try to figure out an appropriate bonus threshold level in the discussions.

It also is of some significance to the Court that one of the items listed on Plaintiff's Exhibit [No.] 3 apparently represents an estimate of collections and overhead of some fifteen thousand dollars. In the evidence and the testimony here today, the Plaintiff acknowledged that he really didn't expect to receive that fifteen thousand dollars, but that is one of the items that goes to make up the total shown of a hundred forty-one thousand six hundred dollars.

In the contract *** entered into July 18th, 1986, the figure one hundred forty thousand appears ***, but it appears as the amount at which a bonus would be available to the Plaintiff. It seems to the Court that that detracts from the reasonableness of the Plaintiff's version that he was to get some one hundred forty thousand dollars in compensation including a specific fourteen thousand two hundred fifty dollar profit-sharing contribution annually.

Further, there is nothing in the contract entered into July 18th, 1986[,] about a fourteen thousand two hundred fifty dollar profit-sharing plan contribution to be made on an annual basis and promising a specific amount of a contribution annually to the Plaintiff would be contrary to the procedure and practice for administering the plan which had been in existence for some time and some years.

It is the Court's view that there was no promise or representation to pay fourteen thousand two hundred fifty dollars in profit[ ]sharing annually to the Plaintiff. While he may have thought he would be able to receive some amount as profit[ ]sharing and while he perhaps may not have fully understood the thrust and tenor of Plaintiff's Exhibit [No.] 3, the Court thinks that there is ample evidence of him being warned about the profit-sharing being discretionary from the terms of the July 18th, 1986[,] contract which covers how that works without regard to the testimony of Dr. DiMiceli who indicates he also advised him along those lines. The Court recognizes that there is testimony which has been admitted and acknowledged by Dr. DiMiceli that an error was made by him as to the Plaintiff's eligibility and the misinformation was communicated to the Plaintiff by him. It seems to the Court though that from all the circumstances that the Court has heard about this incor-

rect information, it does not rise to the level of an intentional misrepresentation.

So the Court's view is that the Plaintiff should not recover under the contract counts I, II or III or under the fraud count, Count VI. The Court finds in favor of the Defendants here and against the Plaintiff on all the counts."

The trial evidence indicated the plaintiff was led to believe that he would, under the 1986 contract, be able to participate in the plan immediately. Because of the rules and regulations controlling the plan, this was not so. Eligibility requirements of the plan include the completion of 12 months' employment, within certain dates. Plaintiff, having been first employed as of December 9, 1985, had not met this requirement at the time the contract signed July 18, 1986, became effective.

Plaintiff lists three issues on appeal: First, as to count VI, which involved the misinformation as to when the profit sharing could begin, plaintiff argues it was error for the trial court to require him to prove an "intentional misstatement" when it would be sufficient to have proved the misrepresentation was made "in culpable ignorance of the truth"; second, as to counts I, II, and III, plaintiff argues the trial court misapplied the provisional-admission approach to the parol evidence rule; and third, plaintiff argues the verdict as to all four counts was contrary to the manifest weight of the evidence.

### A. *Fraudulent Misrepresentation*

The first issue arises because of the trial court's verbal statement at the end of the trial that "the Court has heard about this incorrect information, it does not rise to the level of an intentional misrepresentation." Plaintiff argues an action for fraudulent misrepresentation can be based upon the allegations of misrepresentation in reckless disregard of the truth, as well as knowing of the false nature of a statement. However, the decisions cited as authority require a finding that the statement made must have been known to be false or made in culpable ignorance of the truth or falsity. (*Oltmer v. Zamora* (1981), 94 Ill. App. 3d 651, 653, 418 N.E.2d 506, 508; *Wright v. Richards* (1986), 144 Ill. App. 3d 450, 457, 494 N.E.2d 1269, 1274; *Broberg v. Mann* (1965), 66 Ill. App. 2d 134, 139, 213 N.E.2d 89, 92.) Plaintiff goes one step further and contends that due to DiMiceli's long-time association with the plan, if he did not know of the 12-month eligibility requirement, "his ignorance was culpable." He also contends if DiMiceli was ignorant of the eligibility requirements, he must have been aware of his ignorance. Having examined half (since every other page is miss-

ing from the record on appeal) of the 69-page plan and the plan summary furnished plaintiff, we are inclined to believe this last argument arises from fairyland. The complexities of qualified profit-sharing plans prohibit this court from charging corporate officers, such as DiMiceli, with knowledge of all significant requirements of such plans.

■ For the reasons stated previously, relating to the complexity of the profit-sharing plan, we find it difficult to envision a finding of culpable ignorance in this case. However, we hold such a determination unnecessary because of waiver. Our close examination of the record indicates the "culpable-ignorance test" was never brought to the trial court's attention. While the second amendment of the amended complaint provided an allegation of "reckless regard for the truth," the specific allegation of culpable ignorance was never made. On more than one occasion during the pretrial proceedings, plaintiff maintained that all allegations in count VI were based upon an intent to defraud and alleged a scheme or device to defraud plaintiff.

The plaintiff argues the culpable-ignorance test for the first time before our court. Failure to bring this issue to the trial court's attention results in waiver. Issues not raised in the trial court will not normally be considered by this court on appeal. *Brown v. Lober* (1979), 75 Ill. 2d 547, 556, 389 N.E.2d 1188, 1193; *Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 303, 443 N.E.2d 575, 577.

### B. *Application of Parol Evidence Rule*

The primary objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract. (*Zale Construction Co. v. Hoffman* (1986), 145 Ill. App. 3d 235, 241, 494 N.E.2d 830, 834.) Whether or not the contract is ambiguous is a question of law, and the court may consider extrinsic evidence provisionally for the limited purpose of determining whether an ambiguity exists. (*Zale*, 145 Ill. App. 3d at 241, 494 N.E.2d at 834.) Plaintiff contends the trial court erred in the application of the "provisional admission approach to the parol evidence rule" when ruling as to counts I, II, and III of the complaint. Plaintiff contends the trial court should have "first ma[d]e a finding as to the terms of the integrated contract." Plaintiff suggests (citing as authority *U R S Corp. v. Ash* (1981), 101 Ill. App. 3d 229, 427 N.E.2d 1295):

> "Then the Court may admit evidence on a provisional basis to determine whether there is any ambiguity in the integrated contract. Such evidence is admitted not to vary or change the terms of the integrated contract but to determine the meaning of terms used in the integration."

The *URS* opinion relied upon *Ortman v. Stanray Corp.* (7th Cir. 1971), 437 F.2d 231, which in turn was interpreting Illinois law. *URS* involved an easement for underground storage of "natural gas or other gases or vapors" and the issue was whether "air" was included within other gases or vapors. (See *URS*, 101 Ill. App. 3d at 233, 427 N.E.2d at 1299.) *URS* held relevant parol evidence is always admissible to assist in the determination of the meaning of the words "in an integrated contract." The parol evidence rule is not being violated because evidence is being used to interpret meanings of terms, not change those terms. In such cases, evidence of prior negotiations does not contradict or change terms, but is limited to interpretation of terms. See *URS*, 101 Ill. App. 3d at 234-35, 427 N.E.2d at 1299-1300.

■ We determine that sections 402 and 403 of Contracts in American Jurisprudence 2d exceed both *URS* and *Ortman* in clarity in setting forth the appropriate rule of law:

"Contradicting, varying, or explaining written contract[.]

As intimated earlier, and in accordance with the general rule of evidence that parol evidence is inadmissible to vary or contradict the terms of a valid, and plain and unambiguous, written contract, no preliminary negotiations, and no parol agreement prior to, or contemporaneous with, a written contract, which tends to vary or contradict either its express provisions or its legal import, can be considered in construing it. A parol agreement inconsistent with a written agreement made contemporaneously therewith is void and unenforceable, unless it was omitted from the written contract by fraud, accident, or mistake. Parol understandings, although they induce the making of a written contract, are merged in the writing so that they cannot be used to change the contract or show any intent different from that expressed in the instrument." 17A Am. Jur. 2d *Contracts* §402, at 428-29 (1991).

"Ambiguous or uncertain contract[.]

The explanation of an ambiguous or uncertain written contract is something apart from the contradiction or variance of a plain, certain, and unambiguous one. In the construction of an ambiguous or uncertain writing which is intended to state the entire agreement, preliminary negotiations between the parties may be considered in order to determine their meaning and intention and to ascertain in what sense the parties themselves used the ambiguous terms in the writing which sets forth their contract. If the previous negotiations make it manifest in what sense they understood and used those terms, they furnish the

best definition to be applied in the construction of the contract itself. The effect must be limited to a definition of the terms used and an identification of the subject matter, but, if so limited, it makes no difference that the language of the negotiations relates to the future and consists in positive engagements on the part of the other party to the contract. Their effect depends, not upon their promissory obligation, but upon the aid they afford in the construction of the contract in suit, and they are not less effective for the purposes of explanation and definition because they purport to carry the force of the obligation. In the determination of the meaning of an ambiguous or uncertain contract and as an aid to its construction, the court must have recourse, not only to the wording and context of the agreement, but also to the circumstances under which it was made, and to the conferences and correspondence between the parties pending the negotiation of the final agreement." 17A Am. Jur. 2d *Contracts* §403, at 429-30 (1991).

Plaintiff claims the trial court never considered exhibit No. 3 (which included the $14,250 amount) as a factor in interpreting what he contends is an ambiguous contract provision. That provision provides for plaintiff to receive a profit-sharing contribution, but provides no specific amount. Plaintiff's position, as we understand it, is that the court determined the purpose for including $14,250 in exhibit No. 3, instead of focusing on the existence of this amount when deciding whether there was an ambiguous term in the agreement. He complains that the trial court focused on DiMiceli's intent in preparing exhibit No. 3, rather than on his intent in giving the document to plaintiff. We do not so read the trial court's decision.

■ Testimony of plaintiff was that DiMiceli gave him a copy of exhibit No. 3 and told him he would receive $14,250 in profit sharing each year under the contract. DiMiceli testified he used the $14,250 amount to compute the total possible employment cost of plaintiff so that a bonus level could be ascertained. He stated he used exhibit No. 3 to show plaintiff how he arrived at the bonus arrangement. DiMiceli also testified that he had never before paid a bonus. He also testified he did not tell plaintiff he would receive the $14,250 annually. He testified he told plaintiff that contributions to the profit-sharing plan would be at his discretion. In accepting DiMiceli's testimony instead of Rybicki's, a finding of fact resulted (no offer of $14,250) which was incompatible with plaintiff's contention that an ambiguity existed relative to the profit-sharing provision in the July 1986 agreement. We find the trial court's statement indicated consideration of all evidence

and was not a misapplication of the so-called "provisional admission approach."

## C. *Manifest Weight of the Evidence*

Our court will not disturb a trial court's findings unless it is manifestly against the weight of the evidence, as that court is in a superior position to determine credibility, weigh evidence, and determine the preponderance thereof. *Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 110, 382 N.E.2d 1205, 1210.

■ Here, we have conflicting testimony from the two principal parties. We do have specific evidence setting forth requirements of the plan. The plan requires a lump-sum contribution which must benefit all eligible employees. As indicated, it calls for certain percentage allocations. No preferences can be directed by Associates. A fixed $14,250 to plaintiff would result in plaintiff's specific benefit controlling the amounts going to each eligible employee. The plan required that contributions come from corporate income, either current or accumulated. It provided for DiMiceli in his official capacity, with discretion, to determine fiscal contributions which, testimony indicated, was exercised in consultation with his accountant. We recognize DiMiceli's salary withdrawals in the last two years were much larger than normal, and profit sharing on a much larger scale could have been made by decreasing that salary. Regardless, considering all the evidence, we hold the trial judge's conclusion that $14,250 was not part of plaintiff's salary agreement was not against the manifest weight of the evidence.

Neither was the trial court's determination that there was no intentional misrepresentation as to the profit-sharing eligibility date against the manifest weight of the evidence. As we have previously stated, DiMiceli was a medical professional, not an accountant or a lawyer. We will not charge him, as a matter of law, with specific knowledge of the terms of the plan.

Affirmed.

STEIGMANN, P.J., and McCULLOUGH, J., concur.