BRUCE  CARLILE,  Plaintiff-Appellant,  v.  SNAP-ON  TOOLS  *et  al.*,
Defendants-Appellees.

Fourth District    No. 4—94—0743

Argued February 14, 1995.—Opinion filed March 23, 1995.—Rehearing
denied April 27, 1995.

Robert V. Ogren (argued), of Stratton, Dobbs & Nardulli, of Springfield, for appellant.

Steven M. Helm, of Dukes, Martin, Helm & Ryan, Ltd., of Danville, Lisa S. Mankofsky, of Foley & Lardner, of Washington, D.C., and Michael A. Bowen (argued), of Foley & Lardner, of Milwaukee, Wisconsin, for appellees.

JUSTICE COOK delivered the opinion of the court:

Plaintiff Bruce Carlile's second-amended complaint against defendants Snap-on Tools (Snap-on) and Charles Johnson alleged fraudulent misrepresentation and breach of contract with respect to Carlile's employment as a Snap-on dealer. The trial court entered summary judgment for defendants based upon a written release executed by the parties. Carlile appeals, contending (1) the release was obtained in furtherance of a fraudulent scheme perpetrated by defendants and is therefore unenforceable; (2) the release was a general release which did not bar plaintiff's unsuspected claim; and (3) the release was obtained through duress. We reverse and remand.

For purposes of this appeal we must accept as true the facts set out in plaintiff's unrebutted affidavits. Plaintiff is a high school graduate whose work experience through June 1986 consisted of service-oriented jobs, including retail sales manager and service manager of a Goodyear store and service writer at an Oldsmobile dealership. In 1986, he became interested in the possibility of becoming a Snap-on dealer after speaking with one of his fellow employees who was looking into a Snap-on dealership.

Snap-on is a Fortune 500 company and a manufacturer of hand tools sold to professional mechanics throughout the United States through a system of dealerships. Snap-on dealers buy tools and other products from Snap-on, then resell them to customers assigned each dealer by a "list of calls" covering that dealer's geographical area.

Defendant Johnson is a Snap-on field manager who contacted plaintiff and made certain representations to plaintiff concerning a possible Snap-on dealership.

Carlile had three initial meetings with Johnson. During the first meeting, Johnson repeatedly asked plaintiff about his assets and what kind of capital he could obtain to finance a dealership, which Johnson claimed would require an initial investment of $65,000. When Carlile asked questions about the location and size of the territory, Johnson said, "we don't need to get into that right now. We'll do that later." Johnson told Carlile he could make "big bucks" with Snap-on and stated a survey he was performing indicated there were 300 customers in the proposed territory who would buy Snap-on tools if a dealer came around.

Craig Seelman, a Snap-on sales manager, was present at the second and third meetings. Johnson and Seelman represented that within a year, plaintiff could be making what a doctor or lawyer would make, or between $100,000 and $150,000. Carlile was also told the dealership was his own business and he would be responsible for making business-related decisions. He would require 175 to 225 actual customers to support his dealership but Seelman reiterated there would in fact be 300 customers in Carlile's territory. Seelman told Carlile that Snap-on was a "risk-free" investment because if Carlile ever wanted to get out of his dealership, Snap-on would buy back all his inventory and write him a check for the full amount. Snap-on would also help Carlile transfer his outstanding credit accounts to a successor dealer for collection.

Before he decided to become a Snap-on dealer, Carlile went on three "dealer rides," during which the dealers drove to their customers' places of business, collected outstanding accounts, and made some sales. Johnson accompanied Carlile to Carlile's local bank to obtain a loan, where Johnson reiterated the "risk-free" nature of the dealership because of Snap-on's policy to buy back inventory. On July 1, 1986, Carlile traveled to St. Louis, where he leased a van, stocked it with inventory, and signed a dealer agreement and other documents setting forth his rights and obligations as a Snap-on dealer. A clause in the dealer agreement stated that it "supersedes all agreements to date between the parties and together with any written supplements executed by both parties embodies all of the promises, undertakings, and obligations of the parties." The dealer agreement provided that if Carlile decided to terminate his dealership, he could, *with Snap-on's consent*, sell back to Snap-on any inventory in new and saleable condition at the price paid by Carlile.

Carlile was a Snap-on dealer for approximately 12 months. Three

months into his dealership, a series of mechanical problems with his rented van prevented him from working in his territory for a combined period of between three and four weeks. Within six months as a dealer, he began to run short of money. Johnson's solution was to tell Carlile to extend his credit, buy more inventory, and increase his collections. Carlile was assured he could succeed if he followed these "basics." Carlile discovered that his "list of calls" actually numbered between 140 and 145. He also discovered that he was not an independent businessman, because Snap-on regulated his hours and policies. Carlile and his wife had initially invested $58,500, including all their savings, in the dealership and incurred other expenses as a result of refinancing their home. They lost $100,000 as a result of their dealership venture, including most of their original $65,000 bank loan. They sold two vehicles and were forced to move into a smaller house. Carlile stated, "by July 1987, I was facing personal financial ruin."

When Carlile decided to terminate his dealership, he drove his van to St. Louis and spent two days with Johnson checking in his inventory. During that time, Johnson never told Carlile he would be required to sign any documents before he could be reimbursed for his inventory. At the close of the second day, Carlile went with Johnson to Seelman's office. Seelman asked Johnson to leave the room. Seelman then presented Carlile with a form and instructed Carlile to write that the reason he was terminating his dealership was due to the mechanical problems he was having with his truck. Seelman then stated he could give Carlile a check for his returned inventory almost immediately, but it would take eight months or longer if Carlile did not write those words and sign the form. Carlile complied. The form, entitled "Termination Record," reads:

> "I am leaving due to ongoing problems with my truck. The expense for the transmission repairs, is to [sic] much can not keep up with it. This problem deals with Gelco Vehicle Leasing Company. And not Snap-on Corp."

Carlile then read and signed a form entitled "Termination Agreement," which stated Snap-on agreed to pay Carlile for the return of his inventory at current dealer prices. The final paragraph of the termination agreement stated, in pertinent part:

> "[B]oth parties to this Agreement freely waive any and all claims they may have against each other arising out of the Dealership terminated by this Agreement. The dealer agrees that fair consideration has been given by the Company for this Agreement and fully understands this complete release of claims and the negotiated terms of this Agreement."

Carlile received $21,970 for the inventory he returned to Snap-on. Snap-on held back an additional $2,314.80 of inventory proceeds to protect itself for credit (extended credit) which it had extended to Carlile's customers and which Carlile had guaranteed. Carlile turned in another $19,000 worth of outstanding accounts (revolving credit) for his successor dealer to collect. Carlile had personally extended the credit on those accounts and Snap-on had no exposure on them. Carlile would receive 75% of the collected accounts.

In addition to deposition transcripts and his affidavit, Carlile submitted the affidavit of Michael Jorgenson, a former 15-year employee of Snap-on. Facts contained in an affidavit in support of a motion for summary judgment which are not contradicted by counteraffidavits are admitted and must be taken as true for purposes of the motion. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240-41, 489 N.E.2d 867, 871-72.) Jorgenson stated that he had been a manager of Snap-on in several western States and was familiar with Snap-on's national policies. Jorgenson had testified on behalf of several individuals in circumstances "very similar" to Carlile's. Snap-on's scheme involved recruiting dealers and cultivating a relationship of trust between the dealers and the field managers, then convincing the dealers to borrow substantial sums of money to finance a dealership. Snap-on's policy was to recruit new dealers by misrepresenting to them the income potential of a Snap-on dealership and the size of their territory, that the territory they would be servicing was equivalent to all other territories within the branch, that the investment in Snap-on was a risk-free proposition, and that the Snap-on dealership was an independent, sole proprietorship. Snap-on concealed information regarding dealer failure and turnover rates caused by inadequate territories. Field managers were specifically instructed to represent that a successful dealer could earn as much as doctors and lawyers, or up to $100,000 or more a year, in net profit before taxes.

According to Jorgenson, Snap-on's dealers sold tools under a revolving credit program in which dealers personally financed sales and bore the risk of nonpayment. Managers encouraged dealers to extend credit to everyone, even those whose applications for extended credit had been denied by Snap-on. The field managers would often encourage dealers to continue doing business and to continue extending their personal credit to customers, even though the managers knew the dealers would soon be replaced and have difficulty collecting those credit accounts.

According to Jorgenson, Snap-on's policy was to insist that any dealer failure was due to that individual's personal deficiencies and not related to external factors, such as recessions, insufficient custom-

ers or territories. When Snap-on found potential replacements for failing dealers, it embarked upon a program of psychological pressure and coercion designed to speed those dealers' exit from the company. Managers were instructed to tell a failing dealer that he was one of a very few dealers who had not succeeded and that he must not have been "cut out" for the business. Managers were also instructed to tell dealers that if they did not sign the termination agreement, they would not receive payment for their returned inventory and credit accounts, although Snap-on's policy was to buy back the inventory and collect on the credit accounts even if the dealer had not signed the agreement. Misrepresentations were made to dealers to obtain their signatures on termination agreements primarily because the termination agreement contained a release of all claims. Snap-on did not explain to the branch managers the legal effect of each clause of the termination agreement. If any clause was questioned by the dealer, Jorgenson had been instructed to simply insist that the dealer sign the termination agreement.

Summary judgment should be granted only where the pleadings, depositions, affidavits, and admissions on file show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. (*Purtill*, 111 Ill. 2d at 240, 489 N.E.2d at 871.) In reviewing an order granting summary judgment, this court conducts a *de novo* review of the evidence. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209.

■ There are competing policies regarding releases of claims. Public policy favors the settlement of claims, and it is important that claims, once fairly resolved, not be resurrected. On the other hand, releases should not be used as instruments of fraud or oppression. See *Antal v. Taylor* (1986), 146 Ill. App. 3d 863, 866-67, 497 N.E.2d 305, 307.

It is sometimes said that a release is a contract, and the same rules which apply to other contracts (particularly the parol evidence rule) apply to releases. It appears, however, that the courts are much more careful in applying the parol evidence rule to releases than they are to other contracts. The intention of the parties controls the scope and effect of a release, and this intent "is discerned from the language used *and the circumstances of the transaction.*" (Emphasis added.) (*Carona v. Illinois Central Gulf R.R. Co.* (1990), 203 Ill. App. 3d 947, 951, 561 N.E.2d 239, 242.) A release cannot be construed to include claims not within the contemplation of the parties. (*Carona*, 203 Ill. App. 3d at 951, 561 N.E.2d at 242; see *Clear-Vu Packaging, Inc. v. National Union Fire Insurance Co.* (1982), 105 Ill. App. 3d 671,

674, 434 N.E.2d 365, 367-68.) "[N]o form of words, no matter how all encompassing, will foreclose scrutiny of a release [citation] or prevent a reviewing court from inquiring into surrounding circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties." *Ainsworth Corp. v. Cenco, Inc.* (1982), 107 Ill. App. 3d 435, 439, 437 N.E.2d 817, 821.

■ Where there are words of general release in addition to recitals of specific claims, the words of general release are limited to the particular claim to which reference is made. (*Carona*, 203 Ill. App. 3d at 951, 561 N.E.2d at 242.) Where there are only words of general release, the courts will restrict the release to the thing or things intended to be released and will refuse to interpret generalities so as to defeat a valid claim not then in the minds of the parties. (*Gladinus v. Laughlin* (1977), 51 Ill. App. 3d 694, 696, 366 N.E.2d 430, 432; *Beauvoir v. Rush-Presbyterian-St. Luke's Medical Center* (1985), 137 Ill. App. 3d 294, 304, 484 N.E.2d 841, 847.) A general release is inapplicable to an unknown claim. *Farm Credit Bank v. Whitlock* (1991), 144 Ill. 2d 440, 448, 581 N.E.2d 664, 667.

Even where the parties intend to release a specific claim, the release of that claim will not be enforced if there has been fraud, duress, mutual mistake, or, at least in some cases, unconscionability. *Rudolph v. Santa Fe Park Enterprises, Inc.* (1984), 122 Ill. App. 3d 372, 374, 461 N.E.2d 622, 624 (fraud in execution or inducement); *Alexander v. Standard Oil Co.* (1981), 97 Ill. App. 3d 809, 814-15, 423 N.E.2d 578, 582, citing *Kaplan v. Kaplan* (1962), 25 Ill. 2d 181, 186, 182 N.E.2d 706, 709 (duress); *Rakowski v. Lucente* (1984), 104 Ill. 2d 317, 324, 472 N.E.2d 791, 794 (mutual mistake); *Simmons v. Blauw* (1994), 263 Ill. App. 3d 829, 834, 635 N.E.2d 601, 605 (unconscionable release of personal injury claim).

■ Carlile first contends the release did not include a claim for fraud, as that claim was not in the minds of the parties when they signed the release. In deposition testimony, Carlile stated he never considered suing Snap-on while he was still a dealer. When Carlile decided to end his dealership, he did, as defendants contend, realize that (1) his territory did not have the 175 to 225 customers necessary to support a dealership, much less the 300 promised by Johnson; (2) he had not come anywhere close to making the $100,000 to $150,000 figure presented by Johnson; and (3) all aspects of his dealership were regulated by Snap-on and he was, therefore, not a sole proprietor. Carlile testified, however, that when he was signing the termination record and termination agreement, he felt he was a failure, because this was the message Snap-on had drummed into his head. He also noted he was thinking about his bank loans and feeling pres-

sured by Seelman when he signed the agreements. No evidence indicates plaintiff was aware of a legal fraud claim when he signed the release.

The appropriate inquiry is not whether Carlile could or should have been able to discover his fraud claim. The question rather is whether that claim was a claim which the parties intended to release when they signed the release document. There was no discussion between the parties of any fraud claim. The only obligation of Snap-on to Carlile which was discussed was the payment for inventory, and the amount paid Carlile pursuant to the termination agreement was measured exactly by the value of that inventory. The words of general release here should not be interpreted to defeat a claim for fraud which was not in the minds of the parties, certainly not in the mind of Carlile.

■ A genuine issue of material fact also exists whether Carlile was subjected to economic duress when he signed the release. Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances depriving him of the exercise of free will. (*Alexander*, 97 Ill. App. 3d at 814, 423 N.E.2d at 582.) Acts or threats cannot constitute duress unless they are wrongful, but the term "wrongful" extends to acts that are wrongful in a moral sense, as well as acts which are criminal, tortious, or in violation of contract duty. (*Alexander*, 97 Ill. App. 3d at 815, 423 N.E.2d at 582.) Duress cannot be predicated upon a demand which is lawful or upon one's doing or threatening to do that which one has a legal right to do, such as filing a justifiable statutory lien. (*Butler v. Metz, Train, Olson & Youngren, Inc.* (1978), 62 Ill. App. 3d 424, 430, 379 N.E.2d 1255, 1260.) Nor does the defense of duress exist where consent to an agreement is secured because of mere hard bargaining or the pressure of financial circumstances. Rather, the conduct of the party obtaining the advantage must be manifestly tainted with some degree of fraud or wrongdoing in order to invalidate an agreement on the basis of duress. *Alexander*, 97 Ill. App. 3d at 815, 423 N.E.2d at 582-83.

Snap-on argues that in pressuring Carlile to sign the termination agreement it did not threaten to do anything it did not have a right to do. Snap-on contends that under the terms of the dealer agreement it had no obligation to repurchase inventory without its "consent" to do so. Even assuming that is true, there is at least a question of fact whether Snap-on consented here. Snap-on told Carlile to bring his inventory to St. Louis and turn it in, and that Snap-on would repurchase it; Carlile did turn in, and Snap-on accepted, that inventory. Snap-on had no right to refuse to pay Carlile for his inven-

tory, and accordingly, no right to threaten not to make that payment.

Snap-on argues that under the dealer agreement it had the right to apply Carlile's inventory proceeds to amounts owed Snap-on "arising from the purchase of Products, the assignment of open accounts with recourse, or other business activities of the Dealer, as such liabilities shall be finally determined by [Snap-on]." However, for purposes of the motion, it would appear Carlile did not owe Snap-on anything for the purchase of products. Carlile was obligated to Snap-on as the guarantor on some accounts where Snap-on had extended credit to customers, but Snap-on deducted that money from the inventory proceeds it paid Carlile. The record of dealer termination signed by Snap-on's branch manager at the time of termination states that Carlile owed Snap-on nothing.

Professors White and Summers describe an individual who refuses to perform his contract duties unless he receives a concession as an extortionist. They note that, under the Uniform Commercial Code (Code) (see 810 ILCS 5/1—101 *et seq.* (West 1992)), such concessions may be avoided by showing that they are in bad faith or unconscionable. They note that in non-Code cases the consideration doctrine could be used to police against extortion: " 'You gave no new consideration for the concession and you had a preexisting duty to do everything you are to do under the modified arrangement, hence the concession is unenforceable.' " (J. White & R. Summers, Uniform Commercial Code § 1—5, at 47 (2d ed. 1980).) (Under the Code, an agreement modifying a sales contract needs no consideration to be binding (810 ILCS 5/2—209(1) (West 1992)).) *Cf. Wilson v. Hoffman Group, Inc.* (1989), 131 Ill. 2d 308, 321, 546 N.E.2d 524, 530 (any detriment or benefit can constitute consideration).

■ In addition to his own statements, Carlile submitted the affidavit of Jorgenson stating defendants developed a fraudulent scheme to systematically bilk Snap-on dealers of their efforts and capital and, once the dealers were no longer financially viable, Snap-on managers pressured the dealers to sign termination agreements before Snap-on would buy back the dealers' remaining inventory. Fraud, even in the inducement, may justify consideration of prior understandings which would be otherwise excluded under the parol evidence rule. (*Farm Credit Bank v. Isringhausen* (1991), 210 Ill. App. 3d 724, 728, 569 N.E.2d 235, 237-38.) Taking all of plaintiff's allegations as true, as we must on review of a summary judgment motion, we find that plaintiff has alleged sufficient facts to create a question whether defendants' conduct was "tainted with some degree of fraud or wrongdoing." *Alexander*, 97 Ill. App. 3d at 815, 423 N.E.2d at 583.

When a party has had ample time for inquiry, examination and reflection, it is less likely that his will has been overcome by economic duress. (*Alexander*, 97 Ill. App. 3d at 816, 423 N.E.2d at 583, citing *Hyde v. Lewis* (1975), 25 Ill. App. 3d 495, 502, 323 N.E.2d 533, 538.) Moreover, where a plaintiff is aware of the claims he has waived and has had an opportunity to consult with an attorney, it is easier to rebut claims of economic duress. (See, *e.g., Seward v. B.O.C. Division of General Motors Corp.* (N.D. Ill. 1992), 805 F. Supp. 623, 629 (plaintiff a college graduate with significant management experience and a registered real estate agent); *Kewanee Production Credit Association v. G. Larson & Sons Farms, Inc.* (1986), 146 Ill. App. 3d 301, 306, 496 N.E.2d 531, 534 (plaintiffs had discussed legal options with counsel in open court); *Alexander*, 97 Ill. App. 3d at 816, 423 N.E.2d at 583 (plaintiffs aware of claims they waived and consulted with attorney before signing).) The existence of duress generally is one of fact, to be determined in light of all the circumstances surrounding a given transaction. *Schlossberg v. E.L. Trendel & Associates, Inc.* (1978), 63 Ill. App. 3d 939, 943-44, 380 N.E.2d 950, 954.

There is at least a question of fact whether any of the circumstances mentioned were present in the instant case. Carlile was not told he would have to sign anything as a condition to receiving reimbursement for his inventory until the close of the second day of the inventory return, when Seelman sent Johnson out of his office and presented Carlile with papers to sign. Seelman instructed Carlile to complete and sign the termination record, noting that Carlile would be quickly reimbursed only if he completed the form as Seelman had suggested, and then handed over the termination agreement to be signed. Carlile was experiencing severe marital difficulties and was facing "personal financial ruin." Given these facts, we hold the trial court erred as a matter of law in granting defendants' motion for summary judgment on the basis that the release was binding.

Defendants argue that even if Carlile has alleged sufficient facts to create a genuine issue of material fact as to the effectiveness of the release, Carlile's acceptance of $21,970 from his returned inventory constituted a ratification of the release. A victim of duress who accepts the benefits flowing from the contract for any considerable length of time ratifies the contract. (*Mellor v. Budget Advisors, Inc.* (7th Cir. 1969), 415 F.2d 1218, 1220-21.) Because the dealer agreement supposedly did not obligate defendants to reimburse Carlile for his inventory, defendants contend the $21,970 payment for that inventory was a benefit flowing from the release. Carlile, however, received the money because he returned his inventory, not because

he signed the release. The cases defendants cite are inapposite to the present situation. In *Seward* and *Mellor*, the plaintiffs signed termination agreements under which they received substantial monthly payments; plaintiffs continued to accept the monthly payments even after they sued on the termination agreements and alleged duress. (*Seward*, 805 F. Supp. at 632-33; *Mellor*, 415 F.2d at 1220.) Carlile was not the recipient of any such continuing "severance" benefits. His situation differs markedly from that of the plaintiffs in *Seward* and *Mellor*, and we are unwilling to extend the doctrine of ratification to the factual scenario at hand.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is reversed and remanded for further proceedings not inconsistent with this order.

Reversed and remanded.

KNECHT, P.J., and McCULLOUGH, J., concur.