BERRYMAN TRANSFER AND STORAGE COMPANY, INC., Plaintiff-Appellant, v. NEW PRIME, INC., d/b/a Prime, Inc., Defendant-Appellee.

Fourth District   No. 4—03—0345

Opinion filed January 15, 2004.—Rehearing denied February 11, 2004.

Edward D. McNamara, Jr. (argued), of McNamara & Evans, of Springfield, for appellant.

Anthony E. Young (argued), of Anthony E. Young, Ltd., of Chicago, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In September 1996, plaintiff, Berryman Transfer and Storage Company, Inc. (Berryman), sued defendant, New Prime, Inc., d/b/a Prime, Inc. (Prime), seeking to enforce an August 1995 contract between the parties. In June 2001, Berryman filed its second-amended complaint.

In October 2002, following a bench trial, the trial court entered judgment in Prime's favor.

Berryman appeals, arguing that the trial court erred by finding that paragraph eight of the parties' contract was ambiguous and entering judgment in Prime's favor. We reverse and remand for the trial court to enter judgment in Berryman's favor and assess damages.

## I. BACKGROUND

Because the parties are familiar with the evidence presented at

the September 30 through October 1, 2002, bench trial, we review it only to the extent necessary to put the parties' arguments in context.

Berryman and Prime were both companies in the business of transporting goods via truck and brokering the transportation of goods. When Berryman acted as a broker, a customer (the shipper) paid Berryman to transport its goods. Berryman, in turn, found a contract carrier to transport those goods. Berryman made money when it found a contract carrier to transport the goods for an amount less than it had been paid by its customer. Berryman commonly referred to its customers as its "accounts."

In 1995, one of Berryman's accounts was Nichols Aluminum, Inc. (Nichols), located in Lincolnshire, Illinois. In August 1995, Berryman entered into a contract with Prime, pursuant to which Prime agreed to work as a contract carrier for Berryman. Paragraph eight of the parties' contract provided as follows:

> "Carrier understands and agrees that [b]roker has put forth substantial effort and investment in order to develop its accounts and it will at no time during the term of this [a]greement, and for a period of one (1) year after the effective date of termination of this [a]greement, either directly or indirectly, attempt to solicit, divert, by-pass, back-solicit[,] or perform any services for compensation for any account of [b]roker which [b]roker has secured and has previously tendered to [c]arrier for transportation, unless [b]roker has given prior written authorization. In the event that [c]arrier violates the terms of this section, [c]arrier shall be liable to [b]roker for the normal and customary commission which [b]roker would have received for each individual movement, and [c]arrier shall deliver said amount to [b]roker within thirty (30) days after billing of the shipper."

Pursuant to the contract, Berryman tendered to Prime four shipments of Nichols's goods, from Nichols's Lincolnshire facility to a California destination. In early February 1996, Berryman agents were at Nichols's Lincolnshire facility when they noticed that Prime was independently shipping for Nichols. Berryman then pursued its right to commissions under paragraph eight of its contract with Prime, resulting in this lawsuit.

At the bench trial, Michelle Wagner, Nichols's materials manager, testified that Berryman had been a carrier for Nichols since around 1990. In 1995, Berryman was handling about 25% to 30% of Nichols's shipping from the Lincolnshire facility.

Wagner further testified that Nichols first hired Prime as one of its carriers in January 1996. She acknowledged that prior to that time, Nichols had paid Prime for shipping jobs as a "third[-]party

payer." Wagner explained that some of Nichols's product was shipped to a Kentucky company, Worldsource, to be painted. Worldsource was then responsible for arranging the shipping of the painted product to Nichols's customers, even though Nichols covered the cost of that shipping. Worldsource had hired Prime to do some of its shipping of Nichols's product. As a result, between October 1994 and July 1995, Nichols paid Prime a total of $53,221.34 for shipping its goods from Worldsource to Nichols's customers.

Prime argued at trial that paragraph eight of the contract did not require Prime to pay Berryman a commission for shipping jobs Prime did for Nichols because Nichols was a preexisting account of Prime.

At the conclusion of the trial, the trial court ruled in Prime's favor, upon finding that Nichols was an account of Prime when Prime moved Nichols's product from Worldsource to Nichols's customers prior to Berryman and Prime entering into the August 1995 contract. The court further stated, in pertinent part, as follows:

> "[T]he evidence in this case suggests and supports a finding by the [c]ourt that Prime was doing business with [Nichols] for some months prior to the time that the contract binding the parties here was entered into. *** It seems to me that the document is ambiguous, at least to the extent that issues arise as to what happens if the carrier under [p]aragraph [eight] has previously done business with the, what's the phrase that's used in here, the account. I would have absolutely no problem awarding damages to [Berryman] if [Prime] had not billed and done business with [Nichols] prior to that—prior to the date of the contract."

This appeal followed.

## II. ANALYSIS

Berryman argues that the trial court erred by determining that paragraph eight of the contract was ambiguous. We agree.

The determination of whether a contract is ambiguous is a question of law; we thus review that determination *de novo*. *Shields Pork Plus, Inc. v. Swiss Valley Ag Service*, 329 Ill. App. 3d 305, 311, 767 N.E.2d 945, 949 (2002). A contract is ambiguous when its language is " 'susceptible to more than one meaning [citation] or is obscure in meaning through indefiniteness of expression.' " *Shields Pork Plus*, 329 Ill. App. 3d at 310, 767 N.E.2d at 949, quoting *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 617, 529 N.E.2d 1138, 1145 (1988).

The trial court found paragraph eight to be ambiguous because it did not address whether it applied when, as in this case, the contract carrier had previously done business with the broker's account. We disagree with the court's determination that the absence of an excep-

tion for preexisting business relationships constitutes an ambiguity in the contract terms. Pursuant to paragraph eight of the contract, Prime agreed not to perform any service for compensation during the term of the contract (and for a period of one year thereafter) for any account that Berryman had tendered to Prime, without paying Berryman the customary commission. Paragraph eight provides one exception—namely, when Berryman provides "prior written authorization." Paragraph eight does not provide an exception for Berryman accounts for whom Prime had previously worked. In ruling as it did, the court, in essence, added that exception to paragraph eight and thus provided Prime with a better bargain than Prime had negotiated for itself.

██ █ Illinois recognizes a strong presumption against provisions that easily could have been included in a contract but were not. *Miner v. Fashion Enterprises, Inc.*, 342 Ill. App. 3d 405, 417, 794 N.E.2d 902, 914 (2003). Further, "the rights of parties to a contract are limited by the terms expressed in the contract and courts may not rewrite language or add provisions to make the agreement more equitable." *Jewelers Mutual Insurance Co. v. Firstar Bank Illinois*, 341 Ill. App. 3d 14, 26, 792 N.E.2d 1, 11 (2003) (McBride, P.J., specially concurring in part and dissenting in part); *Shields Pork Plus*, 329 Ill. App. 3d at 312, 767 N.E.2d at 950 (recognizing that courts will not add terms to a contract about which the contract is silent); *Frederick v. Professional Truck Driver Training School, Inc.*, 328 Ill. App. 3d 472, 481, 765 N.E.2d 1143, 1152 (2002) (quoting *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 349, 736 N.E.2d 145, 154 (2000), for the "well-established" rule that " 'where the terms of a contract are clear and unambiguous, they must be enforced as written, and no court can rewrite a contract to provide a better bargain to suit one of the parties' "). Accordingly, we conclude that the trial court erred by determining that the contract was ambiguous because it failed to provide an exception for Prime's preexisting business relationships and entering judgment in Prime's favor.

## III. CONCLUSION

For the reasons stated, we reverse and remand for the trial court to enter judgment in Berryman's favor and assess damages.

Reversed and remanded.

APPLETON, J., concurs.

JUSTICE COOK, dissenting:
I respectfully dissent and would affirm the decision of the trial court.

Berryman and Prime, trucking companies, entered into a contract on August 14, 1995, under which Prime agreed to make shipments, as requested by Berryman, which Berryman had previously contracted to make for various shippers. The contract was a fill-in-the-blank standard-form contract regularly used by Berryman. The contract did not identify any shippers by name. The contract provided that Prime would not solicit "any account of [Berryman] which [Berryman] has secured and has previously tendered to [Prime] for transportation." If Prime violated that provision, Prime "shall be liable to [Berryman] for the normal and customary commission which [Berryman] would have received." In August and September 1995, pursuant to the contract, Berryman requested that Prime make some shipments for Nichols. Then in January 1996, Prime made some shipments for Nichols without any involvement by Berryman.

The problem is that prior to the date of the contract, Prime was already making shipments for Nichols. Some of Nichols's product was shipped to a Kentucky company, Worldsource, where it was painted and shipped on to Nichols's customers. Worldsource hired Prime to do some of that shipping, but it was Nichols's product that was being shipped, and it was Nichols that paid Prime for the shipment.

Michelle Wagner testified that she is the materials manager at Nichols. According to Wagner, Nichols paid Prime $53,221.34 for shipping services between October 1994 and July 1995 for the shipments from Worldsource in Hawesville, Kentucky. On October 3, 1994, Prime was given a supplier identification number by Nichols. On October 24, 1994, Kevin Hanks of Prime contacted Nichols to solicit its business. On November 21, 1994, Nichols requested Prime's federal identification number. In May 1995, Hanks sent rate proposals to Nichols, quoting rates from Lincolnshire, from Hawesville, and from other locations. In January 1996, Nichols began direct use with Prime, due to an increase in shipments to a customer in Helena, Arkansas. Wagner, who was unaware of the contract between Berryman and Prime, felt that many of the loads Berryman complained of, which had been given to Prime, would not have been given to Berryman: "If Prime wouldn't have been able to, I would have called other carriers, not Berryman. They were not an area that Berryman typically covered for us, or we didn't have a good rate at that time."

The majority chooses to decide this case on the basis of legal rules and to ignore the intent of the parties. The majority assumes that any work Prime does for Nichols during the term of the contract (and for a period of one year thereafter) requires Prime to pay Berryman a commission. The only exception is where Berryman "provides 'prior written authorization.' " 345 Ill. App. 3d at 863. There is no "excep-

tion for Berryman accounts for whom Prime had previously worked." 345 Ill. App. 3d at 863. "In ruling as it did, the court, in essence, added that exception to paragraph eight and thus provided Prime with a better bargain than Prime had negotiated for itself." 345 Ill. App. 3d at 863.

The modern approach to contract law is to attempt to interpret contracts as the parties and business people would interpret them. Course of dealing, usage of trade, and course of performance may be considered to explain or supplement the terms of an agreement even without a determination that the agreement is ambiguous. 810 ILCS Ann. 5/2—202, Uniform Commercial Code Comment (1)(a) (Smith-Hurd 1993) (rejecting the premise that the language used has the meaning attributable to it by legal rules of construction rather than the meaning that arises out of the commercial context in which it was used); see also *Towne Realty, Inc. v. Shaffer*, 331 Ill. App. 3d 531, 545, 773 N.E.2d 47, 58 (2002) (Cook, J., dissenting) (rule of construction against drafter does not attempt to discern intent of parties but simply decides who will win the case, like flipping a coin). "In interpreting a contract, it is axiomatic that the primary goal is to give effect to the intent of the parties." *Putnam v. Village of Bensenville*, 337 Ill. App. 3d 197, 209, 786 N.E.2d 203, 211 (2003); see also *Shields Pork Plus*, 329 Ill. App. 3d at 310, 767 N.E.2d at 949.

The courts have come to disfavor strict contract interpretation and have recognized the impossibility of ascertaining the intended meaning of an agreement without reference to evidence of surrounding circumstances, even though the agreement at issue was not "ambiguous." *First Bank & Trust Co. of Illinois v. Village of Orland Hills*, 338 Ill. App. 3d 35, 47-48, 787 N.E.2d 300, 310-11 (2003); *cf. Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 463-64, 706 N.E.2d 882, 885 (1999) (retaining "four-corners rule" for determining ambiguity where contract contains an explicit integration clause); see 810 ILCS 5/2—202(b) (West 2002) (consistent additional terms not reduced to writing may not be proved if writing intended as a complete and exclusive statement of the terms of the agreement). " 'The meaning of words cannot be ascertained in a vacuum.' " *URS Corp. v. Ash*, 101 Ill. App. 3d 229, 234, 427 N.E.2d 1295, 1299 (1981), quoting *Ortman v. Stanray Corp.*, 437 F.2d 231, 234-35 (7th Cir. 1971); *Michael Nicholas, Inc. v. Royal Insurance Co. of America*, 321 Ill. App. 3d 909, 915, 748 N.E.2d 786, 792 (2001) (insurance contract). "An insurance policy is not to be interpreted in a factual vacuum ***. What at first blush might appear unambiguous in the insurance contract might not be such in the particular factual setting in which the contract was issued." *Glidden v. Farmers Automobile Insurance Ass'n*, 57 Ill. 2d 330,

336, 312 N.E.2d 247, 250 (1974). " '[N]o form of words, no matter how all encompassing, will foreclose scrutiny of a release [citation] or prevent a reviewing court from inquiring into surrounding circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties.' " *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 839, 648 N.E.2d 317, 321 (1995), quoting *Ainsworth Corp. v. Cenco, Inc.*, 107 Ill. App. 3d 435, 439, 437 N.E.2d 817, 821 (1982).

The majority recites the catchphrase that "Illinois recognizes a strong presumption against provisions that easily could have been included in a contract but were not." 345 Ill. App. 3d at 863. Under that principle, we could rule for either of the parties in this case: Prime could have included a provision that no commission was due on shipments related to Prime's precontract dealings with Nichols; Berryman could have included a provision that a commission was due on such shipments. Under the majority's approach, every contract dispute should be dismissed because the parties could have included language that would have made the contract clear. The cases that apply the phrase, however, are not cases involving uncertain language, but cases where the language is beyond dispute. See *Klemp v. Hergott Group, Inc.*, 267 Ill. App. 3d 574, 580, 641 N.E.2d 957, 962 (1994) (plain language of agreement clearly indicated defendants were only required to pursue rezoning before the city council); *Cress v. Recreation Services, Inc.*, 341 Ill. App. 3d 149, 185, 795 N.E.2d 817, 850 (2003) (parties made no attempt to limit measure of damages available on breach).

*Shields Pork Plus*, cited by the majority in support of the presumption " 'against provisions that easily could have been included in the contract but were not,' " was actually critical of the presumption and refused to apply it. *Shields Pork Plus*, 329 Ill. App. 3d at 312, 767 N.E.2d at 950, quoting *Klemp*, 267 Ill. App. 3d at 581, 641 N.E.2d at 962 (parties *did* include term; fact that it was ill-defined did not mean parties intended contract to be silent as to that term). The presumption at best restates the obvious: if the contract says "orange," it should not be read to say "blue." If the parties wanted to say "blue," they could easily have done so.

Modern authorities have considered the course of dealing between the parties even absent a finding of ambiguity. See 810 ILCS 5/2—202, 1—205 (West 2002). In the present case, however, it is clear an ambiguity exists. When the language used is susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression, a contract is properly considered ambiguous. *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 617, 529 N.E.2d 1138, 1145

(1988). Does the language, "for any account of [Berryman] which [Berryman] has secured," include accounts Berryman *did not secure* but which were Prime's preexisting accounts? Does the language, "shall be liable to [Berryman] for the normal and customary commission which [Berryman] would have received," require payment for commissions Berryman *would not have received*? It is not at all clear that those questions should be answered in the affirmative. The contract is ambiguous.

While the question whether an ambiguity exists is one of law, the question of the effect of that ambiguity is one of fact. We will not disturb a trial court's finding of fact unless it is manifestly against the weight of the evidence, as that court is in a superior position to determine credibility, weigh evidence, and determine the preponderance thereof. *Rybicki v. Anesthesia & Analgesia Associates, Ltd.*, 246 Ill. App. 3d 290, 301, 615 N.E.2d 1236, 1244 (1993). The trial court found "that Prime was doing business with this company [Nichols] for some months prior to the time that the contract binding the parties here was entered into." The trial court found "that the document is ambiguous, at least to the extent that issues arise as to what happens if the carrier under [p]aragraph [eight] has previously done business with the, what's the phrase that's used in here, the account." Based on Wagner's testimony that the product shipped to Worldsource was always Nichols's product, from the time that it went to Worldsource, while it was at Worldsource, and after it left Worldsource until it reached the ultimate consumer, the trial court found "that in fact this was an account of Prime prior to the date of the contract." The trial court's decision was not contrary to the manifest weight of the evidence.

There is another way to look at this case. Even if we assume no ambiguity and refuse to look outside the contract, Berryman is entitled to a commission only on accounts it "has secured and previously tendered" to Prime. Berryman is only entitled to commissions which it "would have received" for a particular movement. The trial court was entitled to conclude that Berryman did not secure and tender the Nichols business to Prime, that Prime had already done business that Prime would have received the shipments complained of even without the relationship with Berryman. Berryman had to prove that the complained-of work was on an account it had secured and tendered to Prime. Berryman failed to do so. The amazing thing about the majority's holding is that if Prime had done nothing more than continue to make Nichols's Worldsource shipments as it had been doing since 1994, Prime would have owed Berryman a commission on any shipments after the date of the contract, August 14, 1995. Those

shipments were certainly not secured by Berryman, but the majority would read that requirement out of the contract.

The argument could be made that, in determining Nichols was not an account secured by Berryman and tendered to Prime, the trial court rendered the contract meaningless. That argument would be incorrect. The contract applied to any shipments tendered by Berryman to Prime, not just the Nichols shipments. There may have been shippers other than Nichols, where Berryman in fact secured the account and tendered it to Prime.