No. 2--07--0667     Filed: 11-19-09
Supplemental Filed: 2-3-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| CORINNE THOMPSON, Indiv. and as Independent Administrator of the Estate of Trevor Thompson, Deceased, and as Independent Administrator of the Estate of Amber Thompson, Deceased, | ) ) ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellant, | ) ) ) | |
| v. | ) ) | No. 98--L--945 |
| CHRISTIE GORDON; GRAND AVENUE PROPERTIES, INC.; GURNEE MILLS (MLP) LIMITED PARTNERSHIP, f/k/a Gurnee Mills Limited Partnership; GURNEE PROPERTIES ASSOCIATED LIMITED PARTNERSHIP; WESTERN DEVELOPMENT CORPORATION; THE MILLS CORPORATION; THE MILLS LIMITED PARTNERSHIP; GURNEE MILLS II LLC; and GURNEE MILLS LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) ) | |
| (Jack E. Leisch and Associates, Inc.; and CH2M Hill, Inc., Defendants-Appellees). | ) ) ) ) | Honorable David M. Hall, Judge, Presiding. |

Modified Upon Denial of Rehearing

JUSTICE O'MALLEY delivered the opinion of the court:[1]

---

[1]This case was fully briefed and ready for disposition on December 19, 2007. The case was

Plaintiff, Corinne Thompson, both individually and as administrator of the estates of her husband, Trevor Thompson, and their daughter, Amber Thompson, appeals the trial court's order granting summary judgment on her claims against defendants, Jack E. Leisch and Associates, Inc., and CH2M Hill, Inc., the engineering companies that designed the bridge and traffic interchange in the area where Trevor and Amber were killed in a motor vehicle accident.[2] For the reasons that follow, we reverse the judgment of the trial court and remand for further proceedings.

In January 1991, defendants entered into a contract with WDC to design a roadway interchange and a replacement for a bridge deck in connection with a larger project WDC was overseeing, to construct a new shopping mall. In a contract attachment describing the scope of defendants' services for "Phase I, Stage A I-94/Grand Avenue interchange improvements," the contract stated that defendants would provide WDC the following services:

**"A. Roadway Design**

Final design and contract plan preparation for the Phase 1, Stage A I-94/Grand Avenue interchange improvements will be provided. The proposed roadway improvements are as described below:

• Redesign Ramp B to two lanes, but maintain one lane at merge to southbound I-94.

---

assigned to the present panel with the dissenting justice designated as author on July 7, 2008. It was transferred to Justice O'Malley as author on October 2, 2009.

[2]Plaintiff also brought claims against several defendants not parties to this appeal: Christie Gordon, Grand Avenue Properties, Inc., Gurnee Mills Limited Partnership, Gurnee Properties Associated Limited Partnership, Western Development Corporation (WDC), The Mills Corporation, The Mills Limited Partnership, Gurnee Mills II LLC, and Gurnee Mills LLC.

     • Provide lane drop recovery area on eastbound Grand Avenue east of Ramp B diverge.

     • Improve Ramp E alignment.

     • Proposed improvements are to tie to the widening of Grand Avenue, which is to be done by others.

Additional related services to be provided include drainage design, roadway lighting design, and utility adjustments.

### B.  Structural Design

Final structural design plans will be provided for deck replacement of the existing Grand Avenue bridge over I-94.  Final structural design plans will also be prepared for a proposed overhead cantilever sign truss on eastbound Grand Avenue, west of Ramp B." Defendants' contract also contained a provision stating that "[t]he standard of care for [defendants'] services will be the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services."

Defendants proposed structural designs for the bridge deck replacement on the Grand Avenue bridge with a median that was four feet wide and approximately seven inches tall.  (The median had been four feet wide and approximately six inches tall.)  Defendants completed their designs in April 1991, and the Illinois Department of Transportation (Department) approved of defendants' proposed designs before it issued a permit to allow construction work to begin.

In November 1998, a vehicle traveling east on Grand Avenue lost control, hit the median separating eastbound and westbound traffic, vaulted into the air, and hit the westbound vehicle in which Trevor and Amber were traveling.  After Trevor and Amber died as a result of the accident,

plaintiff brought suit against defendants for what she alleged was defendants' negligence in designing the bridge deck without considering or designing a median barrier that would have prevented the eastbound vehicle from becoming airborne and causing the accident.

During discovery, plaintiff submitted an affidavit from Andrew Ramisch, a civil engineer who had reviewed the litigation materials and determined that application of "the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services" as laid out in defendants' contract dictated that defendants consider, submit, and design a median barrier to prevent the type of accident that underlies this case.[3] Ramisch also expressed his opinion that "the standard of care *** as it pertained to an assessment for the need of a median barrier for crossover protection was the same whether the design drawings were for a repair or replacement of the bridge deck." Ramisch opined that defendants "[f]ailed to properly consider and analyze all of the available data provided by their consultants *** pertaining to traffic capacities, weave lane failures and decreases in operational service at the interchange" that would result from WDC's overall project. Ramisch said WDC had information that the project would increase traffic by 200% and "create a burden on the interchange." According to Ramisch, if the design work on the bridge deck had been performed within the standard of care, "more probably than not" a barrier would have been designed that would have prevented the accident, and defendants "[were] aware,

---

[3]Ramich's eligibility to provide expert engineering testimony in this case, even though he is not a licensed engineer in Illinois, has been the subject of lengthy litigation. See Thompson v. Gordon, 349 Ill. App. 3d 923 (2004), vacated & remanded by Thompson v. Gordon, 212 Ill. 2d 555 (2004); Thompson v. Gordon, 356 Ill. App. 3d 447 (2005) (reconsideration after supreme court remand), aff'd, Thompson v. Gordon, 221 Ill. 2d 414 (2006).

or should have been aware, of the vaulting characteristic of the existing median" and "should have been on notice that the proposed work was dangerous and likely to cause injury."

Following a hearing, the trial court granted defendant's motion for summary judgment on the ground that the contract, which controlled defendants' duties, "[did] not call for an assessment of the sufficiency of the median barrier" and "[did] not require the defendants to modify or redesign the road surface or the raised median," but instead indicated that "[t]he road surface was to be removed and replaced by others without modification of the existing design." The trial court discounted Ramisch's opinion that the standard of care required consideration of a median barrier, because, according to the trial court, the duties actually laid out in the contract, performed with the requisite care, did not include the study or design of a median barrier. The trial court entered an order making its decision immediately appealable pursuant to Rule 304(a) (210 Ill. 2d R. 304(a)), and plaintiff timely appealed.

On appeal, plaintiff challenges the propriety of the trial court's decision to grant summary judgment to defendants. Summary judgment is proper when the pleadings, depositions, and affidavits demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2--1005(c) (West 2006). Summary judgment is a drastic means of resolving litigation and should be allowed only when the moving party's right to judgment is clear and free from doubt. Jackson v. TLC Associates, Inc., 185 Ill. 2d 418, 424 (1998). Thus, in adjudicating a summary judgment motion, a trial court must construe the evidence strictly against the movant and liberally in favor of the nonmoving party. Jackson, 185 Ill. 2d at 423-24. Whether summary judgment is proper in a given case is a question of law, to be reviewed de novo. Founders Insurance Co. v. Munoz, 389 Ill. App. 3d 744, 748-49 (2009).

Illinois law is well settled that, to succeed on an action for negligence, the plaintiff must establish that the defendant had a duty to conform to a certain standard of conduct, the defendant failed to meet that standard, and the defendant's failure was a proximate cause of the plaintiff's injuries. Ferentchak v. Village of Frankfort, 105 Ill. 2d 474, 480 (1985).

The parties' primary dispute centers on whether defendants breached a duty by failing to consider or design an improved median barrier. Whether a duty exists is normally a question of law, and "the answer hinges on whether the parties stood in such a relationship to each other that the law would impose an obligation on the defendant to act reasonably for the protection of the plaintiff." Raffen v. International Contractors, Inc., 349 Ill. App. 3d 229, 233 (2004). When a defendant is accused of negligence due to its failure to perform an act allegedly required by a contractual obligation, the existence of a duty will be determined by the terms of the contract, and the scope of the defendant's duty will not be extended beyond those terms. Gilley v. Kiddel, 372 Ill. App. 3d 271, 275 (2007). Therefore, in order to determine whether and to what extent defendants owed plaintiff a duty in this case, we must interpret defendants' contractual obligations.

For a court interpreting a contract, the primary objective is to give effect to the intent of the parties. Gallagher v. Lenart, 226 Ill. 2d 208, 232 (2007). The best indication of the parties' intent is the contract's language, given its plain and ordinary meaning. Gallagher, 226 Ill. 2d at 233. Because words derive part of their meaning from the context in which they are used, a court construing a contract must look at the contract as a whole, by viewing each part of the contract in light of the others. Gallagher, 226 Ill. 2d at 233. If the language of a contract is unambiguous, then the court must derive the parties' intent from the writing itself, without resort to matters extrinsic to

the contract. Paul D. Episcope, Ltd. v. Law Offices of Campbell & DiVincenzo, 373 Ill. App. 3d 384, 391 (2007).

Plaintiff argues that the contract imposed on defendants a duty to consider, and then design, an improved median barrier. Defendants counter by relying on the plain language of their contract, which required them to submit design plans for a bridge deck "replacement"; they interpret the contract's use of the word "replacement" to indicate that their role was limited to submitting designs to recreate the bridge deck exactly as it had existed, rather than submitting designs for an improved or altered bridge deck.

There is authority both to support defendants' interpretation of the word "replacement" and to contradict it. Our supreme court has stated that "[t]he word 'replacement' has a well-understood meaning. Webster defines the word 'replace' as meaning to place again; to restore to a former condition. The word 'replacement' is defined to mean the act of replacing, or state of being replaced." Illinois Central R.R. Co. v. Franklin County, 387 Ill. 301, 309 (1944). However, Webster also defines the word "replace" as "to take the place of" or to "serve as a substitute for or successor of" or to "succeed" or "supplant." Webster's Third New International Dictionary 1925 (1986). Indeed, this second definition of the word comports with common usage in communications such as commercial advertisements, which often invite consumers to "replace" their old and worn-out goods with new and purportedly better products.

Given the competing definitions above, we might have difficulty interpreting the word "replacement" if it stood alone in the contract. However, when we view the contract as a whole, we find additional context to clarify its use of the word. In the paragraph directly preceding the bridge deck replacement paragraph, the contract set out that defendants will prepare plans for "interchange

improvements" or "roadway improvements" to an area near the bridge. The contrast between the contract's use of the word "improvements" in that section and "replacement" in the section relating to bridge work suggests that defendants are correct that the parties to the contract contemplated that defendants would submit plans to rebuild the bridge deck (and accompanying median) exactly as it already existed. See Bank of Ravenswood v. City of Chicago, 307 Ill. App. 3d 161, 166 (1999) ("An improvement is ' " '[a] valuable addition made to property *** or an amelioration in its condition, amounting to more than mere repairs or replacement ***.' " ' [Citations]"). We therefore agree with defendants' interpretation of the word "replacement" as it was used in their contract.

However, the contract also stated that defendants were to undertake the roadway improvement and bridge deck replacement tasks by employing "the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services." This provision adds an important qualifier to defendants' work on the bridge deck--it provides that, in the process of submitting plans to replace the bridge deck, defendants were obligated to act within the prescribed standard of care. Thus, based on the plain language of defendants' contract, we conclude that they labored under a duty to submit plans to replace the bridge deck as it existed prior to the construction project of which defendants were a part, but they also owed a duty to perform that contractual task using the degree of skill and diligence normally employed by professional engineers.

Having determined as a matter of law what duty the contract imposed on defendants, our next question becomes whether plaintiff has presented any evidence to support her claim that defendants breached their duty. We conclude that she has, in the form of Ramisch's affidavit indicating that an

engineer acting within that standard of care while creating plans to replace the bridge deck would have considered and designed an improved median barrier.

Defendants argue that we may not consider the Ramisch affidavit to help determine the scope of defendants' duty or whether they may have breached it, because under Illinois law, "in the absence of ambiguity contract interpretation is a question of law for which expert testimony would not be appropriate." William Blair & Co., L.L.C. v. FI Liquidation Corp., 358 Ill. App. 3d 324, 338 (2005). However, we interpret the contract independent of the Ramisch affidavit; from the contract's language alone, we determine that defendants owed a duty to use "the degree of skill and diligence normally employed by professional engineers" when they designed the bridge deck replacement. After interpreting the contract to determine that it imposed on defendants a duty to replace the bridge deck by using the degree of skill and diligence normally employed by professional engineers, we move to the next question: whether defendants' actions breached that standard of care. It is when we answer this next question that the Ramisch affidavit becomes important.

The contract's articulation of defendants' standard of care matches the standard of care generally applied to professionals under Illinois law. See Advincula v. United Blood Services, 176 Ill. 2d 1, 23 (1996) ("In Illinois, the established standard of care for all professionals is stated as the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances"). As our supreme court has explained, "in professional negligence cases, unlike negligence actions in general, the plaintiff bears a burden to establish the standard of care through expert witness testimony." Advincula, 176 Ill. 2d at 24; see also Jones v. Chicago HMO Ltd., 191 Ill. 2d 278, 295 (2000) ("Expert testimony is necessary to establish both (1) the standard of care expected of the professional and (2) the professional's deviation from the

standard"). This special rule stands to reason for cases involving application of a professional standard of care, because "lay juror[s] [are] not skilled in the profession and thus [are] not equipped to determine what constitutes reasonable care in professional conduct without the help of expert testimony" (Jones, 191 Ill. 2d at 295). See also Plank v. Holman, 46 Ill. 2d 465, 471 (1970) (expert testimony is proper if it offers "knowledge and application of principles of science beyond the ken of the average juror"). Accordingly, although the interpretation of defendants' contract is indeed a question of law, our interpretation of that contract leads us to conclude that the contract imposed a professional duty of care on defendants' work, and the extent of that duty (and whether it was breached) creates a factual question subject to expert testimony.[4] The Ramisch affidavit, which

---

[4]The previous decisions in this case, from this court and the supreme court, have at least implicitly assumed that, if Ramisch were to be qualified as an expert, his opinions would help determine what the professional standard of care was and whether defendants breached it. In holding that Ramisch's lack of an engineering license did not preclude him from testifying as an engineering expert, both we and the supreme court noted that the legislature has required licensure as a prerequisite to expert testimony regarding the standard of care applicable to a medical professional but has not done so for testimony on the standard of care applicable to an engineering professional. Thompson, 356 Ill. App. 3d at 460 ("if the legislature wanted to condition any testimony by a professional on whether the individual holds a state license, it could enact a statute setting standards for such expert witnesses, as it has done in cases in which the standard of care applicable to a medical professional is at issue"); Thompson, 221 Ill. 2d at 433-34 (quoting the passage from our opinion). These passages equate the purpose of the engineering expert testimony brought here to establish the engineering standard of care with the purpose of medical expert testimony brought to

-10-

states that an engineer charged with applying the professional standard of care in designing the interchange and replacing the bridge deck would have, in light of the increased traffic in the area, studied and designed an improved median barrier regardless of whether the contract mentioned a median barrier, offers at least some evidentiary support for plaintiff's position that defendants breached a professional standard of care by failing to consider or design an improved median barrier. Therefore, taking the record in the light most favorable to plaintiff, as we must do at this stage of proceedings, we conclude that the trial court erred in granting defendants summary judgment on the ground that they breached no duty in designing the bridge deck.

We find support for our decision in the First District's opinion in Billman v. Frenzel Construction Co., 262 Ill. App. 3d 681 (1994). In Billman, a contractor overseeing road work pursuant to previous designs was charged with negligence after a motor vehicle accident occurred on the allegedly dangerous roadway that the contractor had created. Although the contractor had performed its contractual duties as expressly described, the First District relied on an expert affidavit, which said that a contractor with the defendant's experience would have noticed that the designs were dangerous and notified the relevant parties of the defects (Billman, 262 Ill. App. 3d at 683), to conclude that there was at least a material question of fact as to whether the defendant contractor had breached a duty (Billman, 262 Ill. App. 3d at 686). Defendants attempt to distinguish Billman by noting what they term "significant factual differences" between it and this case--the defendant in Billman was a contractor and not an engineer, and the accident in Billman occurred in the defendant's work area--but these differences do nothing to undermine the applicability of Billman's basic holding to this case.

_____

establish the medical standard of care.

Defendants further contend that the supreme court's decision in Ferentchak, a case upon which the trial court also relied, dictates that defendants' duties must be confined to those explicitly mentioned in the contract, rather than those implicitly incorporated via the contract's adoption of a professional standard of care. In Ferentchak, the plaintiffs, who suffered flooding damage in their home because its foundation grade level had been set too low, brought an action against, among others, an engineer who had contracted to design and observe the construction of the plaintiffs' subdivision's surface water drainage system. Ferentchak, 105 Ill. 2d at 476. The engineer's designs set out a drainage easement for the entire subdivision (Ferentchak, 105 Ill. 2d at 477), but the plans did not set a foundation grade elevation for any of the individual lots in the subdivision (Ferentchak, 105 Ill. 2d at 478).

The supreme court began its analysis by ruling that the engineer's contract did not create a duty to set the foundation grade levels, but instead specifically provided that the developer of the subdivision "retained control of what was built on the individual lots." Ferentchak, 105 Ill. 2d at 480-81. (The supreme court also noted that the developer accepted the engineer's plans even though they did not indicate foundation grade levels for the individual homes. Ferentchak, 105 Ill. 2d at 481.) The supreme court next considered the plaintiffs' argument that the engineer breached a duty to exercise a proper degree of professional care (Ferentchak, 105 Ill. 2d at 481); the court rejected that argument because, under the engineer's contract, which defined the scope of the duty to exercise professional care, the engineer "was not in a position to set the foundation elevations for the individual lots at the time he developed the water drainage plans" (Ferentchak, 105 Ill. 2d at 482). It further noted that the engineer "did not know what type of custom homes were to be built on each lot" and thus "could not [have been] expected to set these grade elevations" (Ferentchak, 105 Ill. 2d

at 482), and it thus held that it would not impose on an engineer a duty to set foundation grade levels for individual lots "when the engineer does not have adequate information with respect to the type of structures to be erected to enable him to set the foundation levels accurately." Ferentchak, 105 Ill. 2d at 483.

Defendants argue that, as applied here, Ferentchak forbids the imposition of a duty to consider and then design an improved median, because, like the contract in Ferentchak, the contract here does not mention explicitly any such duty. We do not read Ferentchak so broadly. As we read the decision in Ferentchak, the supreme court held the engineer's contract to have created no duty regarding the foundations not because foundations were not explicitly listed among the engineer's duties in the contract, but because the contract indicated that the engineer was to have no involvement in setting the foundation levels and it would have been impossible for the engineer to do so when the types of structures to be built on the individual lots had yet to be determined. In other words, we read the decision as relying on the idea that the engineer had no involvement in the foundation levels and had inadequate information to offer any input, thus making it impossible for the engineer to do what the plaintiffs argued he should have done. We have a different situation here. Defendants in this case, unlike the engineer in Ferentchak, were charged with designing precisely the object (the median barrier) that plaintiff claims was defective. Defendants here, also unlike the engineer in Ferentchak, had full knowledge of all relevant aspects of the allegedly defective design (as well as, according to Ramisch, all the information necessary to realize that the design would be dangerous if reused). Thus, unlike the engineer in Ferentchak, it was quite possible for defendants, using the degree of care normally employed by engineers, to discover that the design they were submitting was dangerous. Even though defendants' contract asked them to submit plans

only to replace the old bridge deck and median, Ramisch stated that engineers following the standard of care dictated by the contract would have discovered the problems and thus had a duty to go beyond the specifically mentioned task of replacing the bridge deck and to ensure that the replacement was safe. In short, we read the essence of the holding in Ferentchak to be that the engineer there had no knowledge about the defective design and no involvement in creating it. Defendants here had both, and, therefore, Ferentchak is distinguishable.

To the extent that Ferentchak stands for the proposition that the tort duties imposed on a defendant pursuant to a contract may not exceed the duties contained in the contract, we do not violate that proposition here. As explained above, we base our holding on the fact that defendants' contract obligated them to employ a professional standard of care in designing a replacement for the bridge deck, and Ramisch's affidavit stands as evidence that defendants breached that standard of care by not considering or designing an improved median barrier, even though the improved median barrier was not explicitly mentioned in the contract.

Defendants also argue that they cannot be said to have breached any duty under the contract, because WDC accepted their work and the Department "reviewed and approved the plans as complying with all state standards and specifications." The difficulty with this argument is that the state's minimum standards and specifications are not necessarily coextensive with the professional standard of care, which may require an engineer to undertake a task not contemplated in the state standards. In fact, plaintiff argues that the Department actually relied on its consultants, such as defendants, to determine what was necessary to ensure a safe new interchange. A violation of the minimum state standards might be strong evidence that defendants breached a duty, but their

compliance with state standards does not prove the opposite proposition that they did not breach a duty.

Defendants nevertheless continue this argument by asserting that they are protected by the rule that, "[i]n Illinois, an independent contractor or engineer owes no duty to a motorist to utilize his judgment in exercising reasonable care in the design, construction, and installation of roadway features when the State of Illinois' specifications are not so obviously dangerous that no competent engineer would follow them." Defendant draws this rule from the supreme court's decision in Hunt v. Blasius, 74 Ill. 2d 203, 209 (1978), which sets out the rule in roughly equivalent language (although it does not use the term "engineer"). However, even if the rule from Hunt were to apply, we cannot say at this stage of the proceedings that it shields defendants, because the exception to the Hunt rule--as defendants put it, an independent contractor cannot follow others' designs when "they are so obviously dangerous that no competent engineer would follow them"--applies to the same extent that defendants breached their professional standard of care as discussed above. That is, the Ramisch affidavit states essentially that a competent engineer would have recognized the danger in replacing the bridge deck as it existed and would not have done so; the affidavit thus causes this case to fall within the exception to the Hunt rule for the same reason that it provides evidence that defendants breached the professional standard of care laid out in the contract. Thus, Hunt does not change our analysis; whether its rule applies or not, defendants may be liable under either it or their contractual duty if they failed to investigate and design a better median barrier when a competent engineer would have done so.

Defendants' final argument is that, even if plaintiff's claim can survive summary judgment on the issues of duty and breach, plaintiff has submitted no evidence to establish that defendants'

negligence was a proximate cause of plaintiff's injury. The term "proximate cause" describes two distinct concepts: cause in fact and legal cause. Abrams v. City of Chicago, 211 Ill. 2d 251, 258 (2004). Defendants' conduct will be considered cause in fact of an injury if it was a material element or substantial factor in bringing about the injury, i.e., if, absent the conduct, the injury would not have occurred. Abrams, 211 Ill. 2d at 258. Legal cause, on the other hand, "is largely a question of foreseeability." Abrams, 211 Ill. 2d at 258. Defendants do not contest that plaintiff has produced sufficient evidence of cause in fact to survive summary judgment; instead, they argue only that plaintiff cannot establish that their alleged breach of duty was a legal cause of the accident.

To support their argument, defendants cite the rule distinguishing causation from conditions or occasions: " '[t]he cause of an injury is that which actually produces it, while the occasion is that which provides an opportunity for causal agencies to act.' " Thompson v. County of Cook, 154 Ill. 2d 374, 383 (1993), quoting Briske v. Village of Burnham, 379 Ill. 193, 199 (1942). "If a defendant's negligence does nothing more than furnish a condition by which injury is made possible, that negligence is not the proximate cause of the injury." Thompson, 154 Ill. 2d at 383. As defendants further note, "[p]roximate cause is also absent where the independent acts of a third person break the causal connection between the alleged original wrong and the injury." Thompson, 154 Ill. 2d at 383. "When that occurs, the independent act itself becomes a proximate or immediate cause." Thompson, 154 Ill. 2d at 383.

Defendants rely on the above authority to argue that, here, even if the median at the scene of the accident was deficient due to their negligence, the median only furnished a condition that allowed the eastbound car to cause the accident. Thus, defendants argue, the intervening acts of the eastbound driver were the actual cause of plaintiff's injuries. When they make this argument,

defendants overlook an important part of the rule governing this type of case. While it "is correct that one may not recover for an injury from the negligent act of an initial wrongdoer when a new and independent force intervenes breaking the initial causal connection and producing the injury," " 'it is fundamental in the law of negligence that there may be more than one proximate cause of injury [citations], and that one is liable for its negligent conduct whether it contributed in whole or in part to the plaintiff's injury, so long as it was one of the proximate causes of the injury.' " Ray v. Cock Robin, Inc., 57 Ill. 2d 19, 23 (1974), quoting Nelson v. Union Wire Rope Corp., 31 Ill. 2d 69, 88 (1964). The key to determining whether an initial wrongdoer's negligence is a cause of an injury or only furnishes a condition for the injury is whether that defendant "might have reasonably anticipated the intervening efficient cause as a natural and probable result of his own negligence," or "whether the intervening efficient cause was of a type that a reasonable person would see as a likely result of his conduct." Abrams, 211 Ill. 2d at 259. Plaintiff presented evidence that defendants should have foreseen that the median they designed would help cause a car to vault into the air and cause an accident: Ramisch opined in his affidavit that defendants "[were] aware, or should have been aware, of the vaulting characteristic of the existing median" and "should have been on notice that the proposed work was dangerous and likely to cause injury." We therefore reject defendants' argument that plaintiff failed to adduce sufficient evidence of causation to survive summary judgment. Because we conclude that plaintiff has presented at least enough evidence to create questions of fact regarding defendants' breach of duty and their causation of plaintiff's injury, we disagree with the trial court's determination that defendants were entitled to summary judgment on those matters.

For the foregoing reasons, we reverse the judgment of the circuit court of Lake County and remand for further proceedings consistent with this opinion.

Reversed and remanded.

BURKE, J., concurs.

JUSTICE HUTCHINSON, dissenting:

The majority's decision represents a disturbing disregard for applicable authority, and therefore, for the reasons set forth below, I respectfully dissent.

The majority's opinion accurately provides that when, as here, a civil defendant is alleged to have breached the standard of care to perform a task required by a contractual obligation, the existence of the defendant's duty will be determined by the terms of the contract, and the scope of the defendant's tasks to be performed and standard of care will not be expanded beyond those terms. Slip op. at 6, citing Gilley, 372 Ill. App. 3d at 275. In order to determine whether and to what extent a defendant owed a plaintiff a duty, we must interpret the defendant's contractual obligations. See slip op. at 6, citing Gallagher, 226 Ill. 2d at 232. When interpreting a contract, the primary objective is to give effect to the parties' intent, which is best indicated by the plain and ordinary meaning of the contract's language. See slip op. at 6, citing Gallagher, 226 Ill. 2d at 233.

Pursuant to these well-settled maxims, I agree with the majority's interpretation of the contract's provisions to the extent that the only contractual task defendants were obligated to perform with respect to the bridge deck and accompanying median was to provide final structural design plans for replacing the bridge deck. This is evident from the contractual terms' contrast of the word "improvement," in article 2, paragraph A, of the attachment to the contract, with the word "replacement," in article 2, paragraph B, of the attachment to the contract. This contrast shows that the parties agreed that defendants would provide only final plans to replace the Grand Avenue bridge deck, and the plain and ordinary meaning of the word "replace" is to rebuild the bridge deck and

-18-

accompanying median as they already existed. See slip op. at 7, citing Illinois Central R.R. Co., 387 Ill. at 309. Thus, according to the majority's interpretation of the contract, the only service defendants were contractually obligated to perform with respect to the bridge deck and median was to provide designs to rebuild the bridge deck and median as they already existed, and pursuant to the authority the majority cites, the scope of that task cannot be extended beyond those terms.

Nonetheless, in what appears to be a strained effort to reach a predetermined result, the majority disregards its own interpretation of the contractual tasks to be performed by defendants and holds that defendants also had an obligation to perform the task of redesigning the bridge deck and median to include a jersey barrier. The majority reaches its contradictory conclusion by relying on the "Standard of Care" provision provided in article 4, paragraph A, of the contract. The provision, in its entirety, provides:

> "The standard of care applicable to [defendants'] services will be the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services. [Defendants] will reperform any services not meeting this standard without additional compensation."

As with the scope of services defendants were required to perform pursuant to the contract, we must also interpret the standard-of-care provision by ascertaining the parties' intent, which is best indicated by the provision's plain and ordinary language (Gallagher, 226 Ill. 2d at 232-33). The plain language of this provision expressly limited the standard of care to "[defendants'] services." In other words, the duty to use the degree of skill and diligence normally employed by a professional engineer was limited to, pursuant to the majority's interpretation of the task defendants were contractually obligated to perform, designing plans to rebuild the bridge deck and accompanying median as they

-19-

then existed. I agree that defendants' task was to provide plans to rebuild the bridge deck and median as they then existed, with the degree of skill and diligence normally employed by a professional engineer, but nowhere does this extend to include a requirement that defendant redesign the bridge deck to include a jersey barrier.

My conclusion that defendants' standard-of-care obligation did not require them to redesign the bridge deck to include a jersey barrier is confirmed by the conduct of the parties both before and after the contract was entered into. When the parties entered into the contract they were aware of how the Grand Avenue bridge then existed--including the type and height of the median--and they still did not negotiate to contractually obligate defendants to redesign the bridge deck to include a jersey barrier. Moreover, after defendants produced designs to replace the bridge deck and median as they then existed, their designs were accepted by WDC, which, as Ramisch acknowledged in his affidavit, had the contractual authority to require defendants to reperform any work that did not meet the standard of care provided for in article 4, paragraph A. Therefore, had WDC believed that constructing a jersey barrier was necessary to meet the standard of care required of professional engineers, it could have directed defendants to reperform their work; WDC did not do so. The Department also approved the plans. Thus, when the contract was entered into, each party had the understanding that defendants had to provide designs only to rebuild the bridge deck and median as they then existed, with the degree of skill and diligence normally employed by a professional engineer, not redesign the bridge deck with a jersey barrier. Once the contract was completed, the parties agreed that defendants completed their contractual tasks and satisfied their standard of care, because the record is devoid of any indication that WDC had defendants reperform any services in relation to the replaced bridge deck and median.

However, in an illogical perversion of contract interpretation, after acknowledging that the only bridge-deck-related task was to provide a design to replace it, the majority avails itself of the contract's standard-of-care provision to rewrite defendants' contract to require an unbargained-for task to redesign the bridge deck to include a jersey barrier even though the existing bridge deck did not already have one. If the parties wanted to place on defendants a project-specific standard of care requiring them to redesign the bridge deck to include a jersey barrier in anticipation of increased traffic from the Gurnee Mills mall, then the parties could have added language to the contractual provision to reflect that. See Lee v. Allstate Life Insurance Co., 361 Ill. App. 3d 970, 979 (2005) (stating that a presumption exists against provisions that easily could have been included in a contract but were not). The parties did not draft any such language, despite having every opportunity to do so. Thus, applying the contractual interpretation tools the majority uses with regard to the tasks defendants were expressly required to perform, because the standard-of-care provision was not project-specific and did not require defendants to redesign the bridge deck to include a jersey barrier, defendants were responsible for providing designs only to rebuild the bridge deck and median as they then existed, under the standard of care applicable to a professional engineer.

The legal and practical implications of the majority's willingness to interpret the standard-of-care contractual provision to impose upon defendants the new unbargained-for task of redesigning the bridge deck to include a jersey barrier are staggering. First, from a legal standpoint, the majority's opinion intentionally disregards relevant and binding authority. In Ferentchak, our supreme court held that the degree of skill and care required of an engineer was dependent upon his contractual obligations. Ferentchak, 105 Ill. 2d at 482. Here, as the majority acknowledges, the only task that was required of defendants pursuant to both the scope-of-services and the standard-of-care

provisions in the contract was to provide final design plans to replace the bridge deck and median as they then existed, with the degree of skill and diligence normally employed by a professional engineer. Thus, in accord with the Ferentchak court's holding, defendant contracted with WDC to perform only the task of designing plans to rebuild the bridge deck and median as they then existed, and to perform that task with the degree of skill and diligence normally employed by a professional engineer, which defendants did. Absent a specific contractual commitment to do so, in either the standard-of-care or the scope-of-services provision, defendants were not required to redesign the bridge deck to include a jersey barrier. See Ferentchak, 105 Ill. 2d at 482-83.

The majority's attempt to distinguish Ferentchak is puzzling. The majority states that it reads that decision as relying on the idea that, because the engineer had no involvement in the foundation levels and lacked adequate information to provide any input, it would have been impossible for the engineer in that case to perform the extra-contractual task of setting foundation levels for individual lots. Thus, according to the majority, "the essence of the holding in Ferentchak [is] that the engineer there had no knowledge about the defective design and no involvement in creating it," and therefore, had no duty to set foundation levels. (Emphasis added.) Slip op. at 14.

Not surprisingly, by focusing on the "essence" of the Ferentchak decision, the majority overlooks the actual holding in that case. When addressing the question of whether, pursuant to his responsibility as a professional engineer, the engineer had a duty to set foundation levels despite the absence of a contractual obligation to do so, our supreme court unequivocally held that "[t]he degree of skill and care required [of the engineer] is dependent on his contractual obligation." Ferentchak, 105 Ill. 2d at 482. The Ferentchak court proceeded to note that because the engineer lacked adequate information he was not in a position to set foundation levels, but this circumstance merely confirmed

its conclusion that the engineer was not under a duty to set foundation levels absent a specific contractual obligation. In other words, by noting that because the engineer did not have adequate information it would have been unreasonable to place a burden on him to set foundation levels, the Ferentchak court did not restrict its holding to provide that an engineer's duty is dependent on his contractual obligations only when he lacks adequate information to perform an extra-contractual task. Rather, the Ferentchak court expressly and unequivocally held that an engineer's duty is dependent only on his contractual obligations, and the engineer's lack of adequate information to set foundation levels in that case merely supported its finding.

The majority also concludes that it does not violate the unequivocal rule put forth in Ferentchak, because defendants' contract obligated them to employ a professional standard of care in designing the replacement of the bridge deck, and Ramisch's affidavit stands as evidence that defendants breached that standard by not considering or designing a jersey median barrier. However, as discussed above, by availing itself of the contract's standard-of-care provision to modify defendants' task from providing designs to rebuild the bridge deck and median as they then existed to redesigning the bridge deck to include a jersey barrier, the majority is imposing a new and unbargained-for task on defendants that was not previously provided in their contract with WDC. In short, the only way to impose on defendants the task to redesign the bridge deck to include a jersey barrier is to impose an obligation not provided in the contract, which is in direct violation of Ferentchak. The majority does this, and then denies doing so while employing its own perverted version of the law.

Further, the majority's claim that it finds support for its decision in Billman, 262 Ill. App. 3d 681, is also confusing. In Billman, the reviewing court relied on an expert's affidavit and found that,

although a <u>contractor</u> overseeing road work pursuant to an already-made design followed its contractual obligations as expressly described, there was at least a genuine issue of material fact as to whether the defendant breached its duty. <u>Billman</u>, 262 Ill. App. 3d at 683-86. The majority here goes on to state that, although the defendant in <u>Billman</u> was a contractor and our defendants here are engineers, this difference does "nothing to undermine the applicability of <u>Billman</u>'s basic holding to this case." Slip op. at 11.

While the majority may be indifferent to the distinction between the duty of a general contractor who follows instructions, as in <u>Billman</u> (<u>Billman</u>, 262 Ill. App. 3d 681), and an engineer who creates a design, as here, our supreme court has repeatedly disagreed and found this distinction to be significant. In <u>Hunt v. Blasius</u>, 74 Ill. 2d 203 (1978), our supreme court held that an independent contractor who merely carries out the specifications provided to him does not owe to third parties a duty to pass on the appropriateness of the plans unless those plans were "so obviously dangerous" that no competent contractor would follow them. <u>Hunt</u>, 74 Ill. 2d at 209. Subsequently, in <u>Ferentchak</u>, our supreme court noted the distinction between a contractor who follows specifications and an engineer who creates designs and expressly held that the " 'so obviously dangerous' " rule adopted in <u>Hunt</u> does not apply to an engineer who creates designs. <u>Ferentchak</u>, 105 Ill. 2d at 479-80, quoting <u>Hunt</u>, 74 Ill. 2d at 209. The supreme court has continued to emphasize this distinction. See <u>Marshall v. Burger King Corp.</u>, 222 Ill. 2d 422, 433 (2006) (noting the distinction between <u>Hunt</u> and <u>Ferentchak</u>).

Pursuant to the above authority, the irrelevancy of <u>Billman</u> to the current matter is manifest. <u>Billman</u> involved a general contractor who performed construction work in connection with a road intersection, whereas here, defendants were engineers who created a design to rebuild a bridge deck

and median as it then existed. Thus, that the court in <u>Billman</u> relied on an expert affidavit to conclude that there was a question of fact as to whether a competent contractor would have known that the designs it followed were dangerous provides no guidance on whether, as I steadfastly maintain, the <u>Ferentchak</u> decision is controlling over the matter currently before us.

In sum, the majority's selective disregard for relevant and binding authority in order to reach what appears to be a predetermined result is disturbing. The issue here is whether and to what extent defendants, as engineers who created a design to rebuild the bridge deck and median as they then existed, owed a duty to plaintiff. This issue was specifically addressed in <u>Ferentchak</u>, which unequivocally held that the scope of an engineer's duty was defined by the terms of his contract, and here, defendants were contractually obligated to perform only the task of designing the plans to replace the bridge deck and median, not redesigning the bridge deck to include a jersey barrier. The majority attempts to distinguish this matter from the <u>Ferentchak</u> decision by focusing on the "essence" of that case while ignoring its actual holding, and then relies on <u>Billman</u> without bothering to address the distinction between a contractor who follows plans and an engineer who creates plans, which our supreme court has repeatedly emphasized. I cannot subscribe to such a legally and logically unsound approach.

Second, from a practical perspective, the majority's decision is unworkable and renders the true intent of the contracting parties meaningless. Illinois recognizes the strong presumption against provisions that could have easily been included in a contract but were not. <u>Berryman Transfer & Storage Co. v. New Prime, Inc.</u>, 345 Ill. App. 3d 859, 863 (2004). Here, as discussed above, the parties could have added language to the standard-of-care or scope-of-services provision requiring defendants to redesign the bridge deck to include a jersey barrier in anticipation of the increased

traffic flow at the Gurnee Mills mall, and to complete that task with the degree of skill and diligence normally employed by a professional engineer, but they did not do so. Now, almost two decades after the contract was negotiated and executed by the parties, defendants' contractual obligations have been after-the-fact modified in contravention of our supreme court's precedent, and in doing so, added a new task--redesigning the bridge deck to include a jersey barrier--even though nothing in the contract indicates that the parties contemplated, negotiated, or bargained for this task. See Gallagher v. Lenart, 367 Ill. App. 3d 293, 301 (2006) ("a court cannot alter, change or modify the existing terms of a contract or add new terms or conditions to which the parties do not appear to have assented, write into the contract something which the parties have omitted or take away something which the parties have included").

The majority's willingness to modify a defendant's standard of care, resulting in new and previously unknown services to be performed, will have a chilling effect on contracting parties, as exemplified by the current matter. In January of 1991 defendants and WDC entered into a contract that expressly obligated defendants to perform the specific task of providing plans to rebuild the bridge deck and median as they then existed. Both defendants and WDC were aware of the manner in which the bridge deck existed before the contract was entered into. Defendants performed their contractual task, and WDC did not object to the work, even though pursuant to the contract it had the express authority to require defendants to reperform any work that was not completed within the express standard of care. Defendants' work was then approved by the Department. Now, nearly two decades later, the majority is modifying provisions of the contract, pursuant to an affidavit that provides merely that a professional engineer would have redesigned the bridge by considering, recommending, and designing a jersey median barrier despite not being under an express contractual obligation to do so. One could not blame defendants, or any other contracting party for that matter,

for being reluctant to enter into future contracts out of a fear that their contractual obligations, duties, and potential liabilities thereunder will be rewritten nearly 20 years later.

For these reasons, I dissent.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

In their petition for rehearing, aside from parroting arguments raised by the dissenting justice, defendants repeatedly, and in a way that is contrary to their interests, mischaracterize our opinion. We therefore today supplement our opinion to correct the mischaracterizations.

Defendants state that we "found that [they] were required to fully redesign the bridge deck and improve its approaches to include Jersey barriers even though the original deck did not have one and even though the barriers would extend beyond the deck and onto the bridge approaches, outside the scope of the defendants' work." Defendants are wrong. As we stated repeatedly, we hold that there is at least a factual question as to whether defendants owed a duty to investigate an improved median barrier. Holding that there is a question of fact as to whether there was a duty to investigate falls short even of holding that there was a duty to investigate, let alone holding that defendants were "required to fully redesign the bridge deck."

The point defendants ignore now and in their original brief is that plaintiff put forth expert evidence that there was such a duty. The validity of that evidence was litigated for over 10 years, resulting in two prior opinions from this court and two from our supreme court concluding that such evidence is admissible. Even after the supreme court's decisions, defendants point to no effort on their part to rebut plaintiff's affidavit with their own expert testimony regarding the professional duty contained in the contract,. Defendants' strategy follows the trial court's ruling. Although the trial court resolved what was presented as a motion for summary judgment, it in substance granted a motion to dismiss, because it expressly stated that its ruling was based on the contract (which was

part of the pleadings), and not on the expert evidence produced between the pleading and summary judgment stages. In any event, our review is <u>de novo</u>, and we believe that our holding was and is clearly limited to the conclusion that plaintiff has raised a question of fact as to whether the professional standard of care included a duty to investigate the need for an improved median barrier. We certainly do not purport to resolve the question of fact as to whether there was a duty to investigate, or the further question of what might have been required as a consequence of an investigation should the question of whether there was a duty be answered affirmatively. Thus, defendants' statement that we have held that defendants must redesign the bridge deck and median (and their argument that they must do so without any additional compensation) is plainly inaccurate and very clearly contrary to defendants' interests. Why defendants would take what we see as clearly a wrongly expansive view of our holding is beyond us, especially where, if they were held to that view on remand, the only issue remaining for trial would be damages.

In another fit of hyperbole, defendants argue that, under our opinion, "if an engineer is asked to design a replacement for a light bulb switch in a building, and he agrees to do this work in accordance with the standard of care for an engineer, the engineer is required to review, analyze, and redesign the entire building." For the reasons we have just repeated, this suggestion is preposterous. To say it yet again, what we have held is that there is a question of fact as to whether the professional standard of care that was incorporated into the contract at issue included a duty to investigate an improved median barrier. What we have not held, and what we state no opinion regarding, is how that question of fact should be resolved. What we certainly have not held is that all engineers in all situations must "review, analyze, and redesign" the entirety of all projects on which they perform minor work, such as designing a light switch. We have little doubt that a moderately effective lawyer could easily provide overwhelming affidavit and other evidence at the summary judgment

-28-

stage to counter any such absurd suggestion, invalidate any purported question of fact, and thus render summary judgment appropriate for such a defendant. Because defendants here have chosen not to argue to us that they can rebut plaintiff's affidavit with their own contrary expert affidavits, and also have not explained to us why they so chose, we of course do not know whether they were able to muster any such affidavit.

Defendants argue that the degree of care it owed was contingent on its contract and that "the WDC contract only required the defendants to prepare plans to replace the bridge deck and median as they existed with the skill and care normally employed by a professional engineer. The contract did not require the defendants to redesign the bridge deck and approaches." As we stated throughout our opinion, the measure of "skill and care normally employed by a professional engineer" is a question of fact, and plaintiff has presented evidence that that standard of care required defendants at least to investigate an improved median barrier.

Defendants argue that our opinion will have the effect of "rewrit[ing] long completed contracts, regardless of the clear intent of the contracting parties, rendering the parties' contractual intent meaningless." However, again, our holding rests on a factual question regarding whether an engineer using the degree of skill and diligence normally employed by professional engineers would have investigated an improved median barrier; the parties chose to include that standard of care in their contract.

Defendants argue that our opinion rests on "the unsupported affidavit of an engineer who is not licensed in Illinois." However, we do not see why the affidavit is "unsupported," and the issue of whether the affiant needed to be an Illinois-licensed engineer has been decided in plaintiff's favor in this same case after a decade of litigation in the trial, appellate, and supreme courts. To the extent that defendants mean to assert that the affidavit evidence is too weak to carry the day, we remind

them of the ubiquitous legal boilerplate regarding genuine questions of fact at the summary judgment stage, and the fact that they did not file any contrary affidavits that they argue, either in their petition for rehearing or in their original brief, rebut plaintiff's affidavit.

Defendants argue that we take "the standard-of-care provision out of context and expand[] the defendants' duties far beyond the contracting parties' intent." However, defendants point to no "context" that should change the meaning of the "professional engineers" standard of care as incorporated in their contract.

Defendants argue that our opinion will cause the cost of public works projects to increase "as capable engineers attempt to price the risk associated with undertaking a duty greater than their contractual scope." As we have said repeatedly now, the source of defendants' potential duty here comes from the contract, which explicitly included a standard of care that, according to plaintiff's evidence, may have included a duty at least to investigate an improved median barrier.

Finally, defendants accuse us of "disregard[ing] well-settled and binding authority and the clear intent of the parties to reach an apparently predetermined result." We are of course aware that the dissenting justice made the same allegation in her dissent. Accusing a court of reaching a predetermined result, i.e., a result determined not on the arguments and evidence set forth to the court but rather on some other basis, is one of the most serious accusations of misconduct that can be leveled against a court. At the risk of stating what should be obvious, whatever the propriety of the dissenting justice's allegation, litigants do not enjoy the prerogative to criticize the court in this fashion, and for a litigant to direct such an accusation at a court is grossly inappropriate. In fact, the accusation constitutes a blatant violation of Rule 8.2 of the Rules of Professional Conduct, which prohibits attorneys from "mak[ing] a statement the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge." 134 Ill. 2d

R. 8.2. The accusation is also a ground for a finding of contempt. Defense counsel are strongly urged to refrain from such conduct in the future.

BURKE, J., concurs.

JUSTICE HUTCHINSON, dissenting:

Illinois law is well settled that "[u]nless a duty is owed, there is no negligence." American National Bank & Trust Co. of Chicago v. National Advertising Co., 149 Ill. 2d 14, 26 (1992). Unless and until the majority can unequivocally hold that defendants had a duty, as a matter of law, to perform the unbargained-for, extracontractual tasks of investigating and designing an improved median barrier, there is no negligence, no need for the majority to discuss whether defendants were in breach for failing to perform those tasks, and no need to reverse the judgment of the trial court. The existence of a duty is a question of law for the court to decide. National Advertising Co., 149 Ill. 2d at 26. And unless and until the majority can expressly hold that defendants had such a duty, its only option is to avail itself of a convoluted legal analysis interpreting the contract's standard-of-care provision to require defendants to perform the unbargained-for tasks of investigating and improving the median barrier.

Despite its continued state of denial, the effect of the majority's decision places a duty on defendants to perform the unbargained-for, extracontractual task of improving the median barrier. In its supplemental opinion, the majority states that "there was at least a question of fact as to whether defendants owed a duty to investigate an improved median barrier." Slip op. at 27. Without stating that a duty exists, the majority skips ahead to the element of breach and wonders whether defendants might have breached their duty to replace the bridge deck by not contemplating and designing a jersey barrier even though, as the majority clearly stated, the only contractual task defendants were obligated to perform was to provide designs to restore the bridge deck to its former

condition. The majority quasi-resolves the element of duty by relying on Ramisch's affidavit, which indicated that an engineer acting within the contract's standard of care would have gone beyond the terms of its contract and considered and designed a jersey barrier.

To state what should be obvious, the majority's supplemental opinion only further highlights the irrelevancy of Ramisch's affidavit at this stage in the proceeding. The "essence" of Ramisch's affidavit is that a professional engineer laboring under the duty to provide designs to replace the bridge deck would have performed tasks beyond the terms of its contract, i.e., investigating and improving the median barrier. However, Ramisch's affidavit does not offer any indication as to whether defendants failed to complete their contractual task of providing designs to replace the bridge deck with the degree of skill and diligence normally employed by a professional engineer. If anything, Ramisch's affidavit is contradicted by the conduct of the parties--which the majority conveniently ignores--because WDC did not require defendants to reperform any work that did not meet the standard of care despite having the contractual authority to do so. Rather, Ramisch's affidavit indicates only that a professional engineer would have gone beyond the terms of its contract and investigated and improved the median barrier, despite not being contractually obligated to do so. The factual question of whether a professional engineer would have gone beyond the terms of its contract and performed the unbargained-for tasks of investigating and designing an improved median barrier bears no significance to the question of whether defendants had a duty, as a matter of law, to perform those tasks in the first place.

Of course, had the majority expressly held that defendants had a duty to perform tasks that extended beyond the terms of its contract with WDC, its holding would have directly disregarded our supreme court's holding in Ferentchak. See Ferentchak, 105 Ill. 2d at 482-83. As I discussed in my dissent, the majority attempts to distinguish Ferentchak by relying on the "essence" of that

opinion while ignoring the actual holding, and in an unfathomable manner, it purports to find support for its holding in Billman without bothering to address the distinction between a general contractor who follows plans and an engineer who creates designs--a distinction our supreme court has repeatedly emphasized. See Marshall, 222 Ill. 2d at 433; Hunt, 74 Ill. 2d at 209.

Finally, in its supplemental opinion, the majority accuses defendants of engaging in "fit[s] of hyperbole" in their petition for rehearing. Slip op. at 28. I disagree with such an accusation. The petition is merely following the majority's illogical holding to exemplify the chilling effect it will have on contracting parties. Again, after concluding that the only task defendants were contractually obligated to perform was to provide final designs to restore the bridge deck to its previous condition, with the degree of skill and diligence normally employed by a professional engineer, the majority holds that there is a question of fact as to whether defendants breached that duty because they did not perform the unbargained-for, extracontractual task of investigating and improving the median barrier. Applying this rationale, it is conceivable that a court may conclude that, if an engineer contracted to design a replacement for a light bulb switch with the degree of skill and diligence normally employed by a professional engineer, there could be a question of fact whether the engineer breached that duty by failing to review, analyze, and redesign the entire building even though the engineer was not under a contractual obligation to perform those tasks. This point raised in the petition mirrors the one I raised in my dissent, i.e., pursuant to the majority's opinion, contractual obligations and duties and potential liabilities thereunder can be rewritten by a court decades after a contract was entered into. As a result, the majority's opinion will have a chilling effect on potential contracting parties' willingness to enter into contracts.

In sum, I continue to respectfully dissent because the majority's opinion disregards binding authority.  Also, because I believe defendants raise valid points in their petition for rehearing, I would grant their petition.